# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

In re:                                              )
                                                    )
DIAMONDHEAD CASINO CORPORATION )          Chapter 7
                                                    )    Case No. 24-11354 (JKS)
                    Alleged Debtor.                 )
_____ )
                                                    )
DIAMONDHEAD CASINO CORPORATION )
                                                    )
                    Appellant,                      )
                                                    )
v.                                                  )
                                                    )    Case No. 1:25-cv-01018-MN
EDSON ARNEAULT,  et al.,                           )
                                                    )
                    Appellees.                      )
_____ )
                                                    )
DEBORAH A. VITALE                                  )
                                                    )
                    Appellant,                      )
                                                    )    Case No. 1:25-cv-01022-MN
v.                                                  )    Case No. 1:25-cv-01167-MN
                                                    )
EDSON ARNEAULT, et al.,                            )
                                                    )
                    Appellees.                      )
_____ )

## BRIEF OF APPELLANT, DEBORAH A. VITALE,
## IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL

DEBORAH A. VITALE
/s/ Deborah A. Vitale
Appellant, Pro Se
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
email: vitaledav@aol.com

October 21, 2025

# TABLE OF CONTENTS

                                                                          PAGE

Table of Citations and Authorities ……………………………………    i

Preliminary Statement ………………………………………………    1

Statement of the Nature and Stage of the Proceedings …………………....    2

Jurisdiction ………………………………………………………….    4

Request for Relief …………………………………………………...    4

Summary of Argument ……………………………………………...    4

Concise Statement of Facts Relevant to the Motion …………………………..    6

**ARGUMENT** …………………………………………………….    8

**Appellant Satisfies the Standard for Granting a Stay Pending Appeal**

1. The Likelihood of Success on the Merits ……...……………………….    9

2. Irreparably Harm if a Stay is Not Granted…………………………….    16

3. A Stay Pending Appeal Will Not Injure Other Parties ………………………    21

4. Granting a Stay is in the Public Interest ……………………………….    24


Notice of this Motion …………………………………………………    29

Conclusion ……………………………………………………..…..    29

Certificate of Service ………..………………………………………..    30

# TABLE OF AUTHORITIES

## CASES

In *re Revel AC, Inc.*, 802 F.3d 558 (3rd Cir. 2015)……………………..…… 9, 21

*Hilton v. Braunskill*, 481 U.S. 770, 776(1987)………………………......…..….. 9

*Singer Mgmt. Consultants, Inc, v. Milgram*, 650 F.3d, 223 (3d Cir. 2011)…..….… 9

*Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3d Cir. 2011)………..…. 17

## STATUTES

28 U.S.C. §158(a)(1)……………………………………………………..……….. 4

28 U.S.C. §§1408 and 1409 ……………………………………………………… 4

11 U.S.C. §303(a)(1) and 11 U.S.C. §303(i)…………………………………….. 13

18 U.S.C. §157 ……………………………………………………………… 14, 25

## RULES

Fed. R. Bankr. P. 8007(a)(1)(A) …………………………………………..……... 4

Fed. R. Bankr. P. Rule 8007(b)(1) ……………………………………….……… 4

FRCP Rule 60(b)(4) ……………………………………………………..…….... 1

FRCP Rule 60(d)(3) ……………………………………………………..…….... 1

## **PRELIMINARY STATEMENT**

The United States District Courts have wasted precious time and limited judicial resources presiding over cases involving limited liability companies, only to learn years, or even decades later, that they lacked subject matter jurisdiction to hear a case and that the orders entered in these cases were void and vacatur the only remedy. This is one of those cases.

This case rests on a fraud perpetrated on two courts-this Court and the United States Bankruptcy Court for the District of Delaware. As will be seen, the Judgment on which this case rests was procured by fabricating subject matter jurisdiction in this Court and then using the Judgment obtained in this Court to file an Involuntary Chapter 7 Petition against the Defendant in the Bankruptcy Court. The Judgment obtained from this Court is void *ab initio* and must be vacated.[1] Likewise, the Bankruptcy Petition, which rests on a Judgment that is void, must be dismissed. Moreover, without the Judgment, the underlying financial instruments on which the Judgment rests, are now uncollectible due to expiration of the applicable statute of limitations. Thus, the Petitioners have no claim against the Debtor. Otherwise put, the Debtor is on the verge of liquidation based on a void Judgment and a continuing fraud on two federal courts.

For the reasons described herein, and because the Judgment on which this entire matter rests is void *ab initio*, a stay is required to allow this Court the time required to review this matter which goes to the integrity of two federal courts.

---

[1] On October 15, 2025, the Debtor filed a motion to reopen Action, Vacate Judgment and Dismiss in *Arneault, et al. v. Diamondhead Casino Corporation* (In the United States District Court for the District of Delaware)(C.A. No. 1:16-cv-00989-LPS), based on a lack of subject matter jurisdiction under Federal Rule of Civil Procedure 60(b)(4) and based on a fraud on the Court under Rule 60(d)(3). However, the Trustee may not allow the Debtor to pursue the case. Therefore, the undersigned Appellant will also be filing a similar motion in this Court to Reopen Action, Vacate Judgment and Dismiss the same case.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCCFEDINGS

1.       On June 12, 2024, the Petitioning Creditors filed an Involuntary Chapter 7 Petition (the "Involuntary Petition") under Chapter 7 of Title 11 of the United States Code against the Debtor, Diamondhead Casino Corporation. [Bankr. D.I. 1].

2.       On July 18, 2024, the Debtor filed a Motion to Dismiss the Involuntary Petition or, in the Alternative, to Convert the Case to a Chapter 11. [Bankr. D.I. 9].

3.       On September 3, 2024, the Petitioning Creditors filed an Answering Brief in Opposition to the foregoing Motion. [Bankr. D.I. 11].

4.       On December 5, 2024 and January 16, 2025, the Court held a hearing on the motion. [Bankr. D.I. 25 and 32]

5.       On February 11, 2025, the Debtor filed its Opening Post-Hearing Brief. [Bankr. D.I. 38] On March 4, 2025, the Petitioners filed their Post-Hearing Answering Brief. [Bankr. D.I. 39]. On March 14, 2025, the Debtor filed its Reply Brief [Bankr. D.I. 40].

6.       On July 30, 2025, the Court entered its Opinion [Bankr. D.I. 42] and Order [D.I. 43] denying the Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11.

7.       On July 31, 2025, the Court entered an Order for Relief in an Involuntary Case. [Bankr. D.I. 45] (the "Chapter 7 Order").

8.       On August 1, 2025, the Court appointed an Interim Trustee. [Bankr. D.I. 46]

9.       On August 13, 2025, the Debtor and the Appellant Vitale filed a Motion to Stay Pending Appeal [Bankr. D.I. 47, D.I. 55].

10.      On August 13, 2025, the Debtor filed a Motion to Vacate the Court's Opinion and Order dated July 30, 2025 and Dismiss the Involuntary Petition or, Alternatively, to Alter and

Amend the Opinion and Order [Bankr. D.I. 63] and a Brief in Support of the Motion [Bankr. D.I. No. 49]. On August 13, 2025, the Appellant Vitale also filed and joined in the foregoing motion and brief filed in support thereof. [Bankr. D.I. 55]

11.    The Court scheduled argument on the motions for October 7, 2025. However, at a status hearing held on August 21, 2025, the Court moved argument on the Motion for a Stay to September 3, 2025. [Bankr. D.I. 76] and required the Debtor to file its Reply to the Petitioners' answering brief, which brief was due August 28, 2025, by September 2, 2025, or within five calendar days of the filing.

12.    On August 28, 2025, the Petitioners filed an Omnibus Objection to the Debtor and Appellant's then-outstanding motions. [Bankr. D.I. 77]

13.    On September 3, 2024, the Court heard argument on the Motion for a Stay and denied the motion. On the same date, the Court also denied the then-outstanding motions relating to the Court's Opinion, scheduled to be heard on October 7, 2025, on grounds it did not have authority to hear the motions, which had not yet been briefed, since the issues raised therein were on appeal to this Court. [Bankr. D.I. 85, TR. 9-3-25, at p. 92]

14.    On September 4, 2025, the Court entered an Order Denying Motions Filed at D.I. Nos. 47, 55 and 63 [Bankr. D.I. 89].

15.    On August 13, 2023, the Appellant filed a Notice of Appeal. [Bankr. D.I. 57].

16.    On August 27, 2025, the Appellant filed a Designation of Items for Inclusion in the Record on Appeal [01022-D.I. 4] and a Statement of the Issues on Appeal [01022-D.I. 5].[2]

---

[2] The Appellant filed an original Notice of Appeal from Orders then-entered by the Bankruptcy Court (Case No. 1:25-cv-01022-MN) and a second Notice of Appeal (Case No. 1:25-cv-01167-MN), which included the Orders originally appealed from and subsequent Orders of the Court issued on September 4, 2025. References to the docket in these two cases will be to 01022-D.I. or 01167-D.I.)

17.     On September 17, 2025, the Appellant filed a Notice of Appeal adding the Order entered by the Court on September 4, 2025 to the Orders of the Bankruptcy Court previously appealed from in the Appellant's prior Notice of Appeal. [01167- D.I. 1 ]

18.     On September 18, 2025, the Appellant filed a Designation of Items for Inclusion in the Record on Appeal. [01167-D.I. 5]. On September 18, 2025, the Appellant filed a Statement of the Issues on Appeal. [01167-D.I. 4].

19.     This is the Emergency Motion for Stay Pending Appeal of Appellant, Deborah A. Vitale.

## JURISDICTION

20.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §158(a)(1)(a) which provides that District courts have mandatory jurisdiction to hear appeals "from final judgments, order, and decrees." Venue in the district is proper pursuant to 28 U.S.C. §§1408 and 1409.

## REQUEST FOR RELIEF

21.     Pursuant to Rule 8007(b)(1) of the Federal Rules of Bankruptcy Procedure and section 105 of the Bankruptcy Code, the Appellant respectfully requests that this Court stay the Order for Relief in an Involuntary Case entered on July 31, 2025 by the Bankruptcy Court [Bankr. D.I. 45] ("**the Chapter 7 Order").**

## SUMMARY OF ARGUMENT

22.     Absent a stay, the Debtor Company and the Appellant herein face imminent and irreparable harm. The Bankruptcy Court's Order [Bankr. D.I. 45] authorizes the immediate liquidation of estate assets under Chapter 7. Absent a stay, the appeal will be rendered moot, causing irreparable and irreversible harm to the Debtor and its stakeholders and, in particular, the

4

Appellant. A stay is required to protect the Appellant's ability to challenge the underlying decision and Order of the Bankruptcy Court on appeal to this Court.

23.     The relief requested is essential to protect the Company's very existence, its regulatory standing with the Securities and Exchange Commission, the value of its publicly-traded entity, the value of its shareholders' common stock, the value of its employees' vested interest in the Company's Employee Stock Ownership Plan, and the Company's standing with the Mississippi Gaming Commission, and the substantial value of an approximate 400-acre property owned by a subsidiary of the Debtor, which has been awarded Gaming Site Approval from the Mississippi Gaming Commission, for a fifty-acre casino site on the property.

24.     The Petitioners, having obtained a Judgment in this Court in *Arneault, et al, v. Diamondhead Casino Corporation* (C.A. No. 1:16-cv-00989-LPS), by excluding the real party in interest and fabricating jurisdiction, subsequently filed an Involuntary Chapter 7 Petition, also grounded in fraud, in the United States Bankruptcy Court for the District of Delaware, using the Judgment improperly obtained in this Court as a basis for the filing.

25.     The Company is now at risk of liquidation because, according to Petitioners, it did not detect the fraud on the Bankruptcy Court within twenty-one days of service of the summons when its responsive pleading was due. The overriding question on appeal is whether a Debtor Company's failure to detect a fraud in a Bankruptcy Court within twenty-one days of service of the summons or, at the latest, at the evidentiary hearing on a motion to dismiss, excuses the initial fraud on the Court and transforms a patently bad faith filing into a good faith filing. A stay is required to allow this Court to resolve that question without the irreversible consequences of liquidation.

## **CONCISE STATEMENT OF FACTS RELEVANT TO THE MOTION**

26.    Generally, a party must first move in the Bankruptcy Court for a stay of a judgment, order, or decree of the Bankruptcy Court pending appeal. Fed. R. Bankr. P. 8007(a)(1)(A). On August 13, 2025, in accord with this Rule, both the Debtor [Bankr. D.I. 47] and the Appellant Vitale [Bankr. D.I. 55] filed a Motion for a Stay Pending Appeal of the Order for Relief entered on July 31, 2025 by the Bankruptcy Court.

27.    On September 3, 2025, the Bankruptcy Court heard argument on the motion for a stay of both the Debtor and Appellant Vitale and denied the motions. [Bankr. D.I. 89].

28.    On September 3, 2025, the Bankruptcy Court rendered its Opinion from the bench. [Bankr. D.I. 92]. The Court, however, also declined to hear, based on procedural grounds, the Debtor's and Vitale's Motion to Vacate the Court's Opinion and Order dated July 30, 2025 and Dismiss the Involuntary Petition or Alternatively, to Alter and Amend the Opinion and Order, which was scheduled to be argued on October 7, 2025, but which had not been briefed yet.  The Court found that it lacked jurisdiction to hear the motion. It stated, in pertinent part, as follows:

> Here, the issue raised in the motions to vacate or dismiss the appeal addresses the same issues that serve as the basis for the appeal; essentially whether the Court erred in denying the motion to dismiss and entering the order for relief. The Court finds under the divestiture-of-jurisdiction rule that this Court lacks jurisdiction to hear the motions to vacate the Court's opinion and order and dismiss the involuntary petition, or, alternatively, to alter and amend the opinion and orders, other than the issue raised with respect to eligible petitioning creditors, which the Court will address in the context of a stay motion. [Bankr. 85, TR. 9-3-25, at pp. 48-49].

29.    The Court denied the Motion for a Stay after considering the four factors relevant to a stay.

6

30.    As to the likelihood of success on the merits, the Court found that the motion for a stay "leaves the Court with the impression that its ultimate ruling is correct and unlikely to be reversed on the merit." [Bankr. D.I. 85, TR 9-3-25, at p. 50]

31.    As to whether the Debtor would suffer irreparable harm, the Court found that the Debtor's arguments relating to irreparable harms were "speculative." [Bankr. D.I. 85, TR 9-3-25, at p. 53]

32.    As to whether a stay pending appeal would injure other parties, the Court found that "the Petitioning creditors debentures continue to be unpaid and bear interest at a fixed rate of four percent per annum;" that "there are other debentures and loans accruing interest;" that "additional administrative expenses continue to accrue," and that the "Petitioners and shareholders will have further delay if a stay is granted and they do not seek a further delay." (Emphasis added.) [Bankr. D.I. 85, TR 9-3-25, at pp. 54-55] [3]

33.    As to the public interest, the Court found that the public interest was best served by "[h]alting losses, marshaling assets, and distributing the assets of a corporate debtor in a fair and orderly fashion for the benefit of all creditors is (sic) the primary purpose of any corporate Chapter 7 case. A recovery on debt is in favor of denying the stay." [Bankr. D.I. 85, TR 9-3-25, at p. 55]

34.    As to the fact that the Petition was filed in bad faith, inasmuch as the largest Petitioner in the Bankruptcy case, *J. Steven Emerson, as Successor to the Steven Emerson Roth IRA*, had no debentures and no claim, the Bankruptcy Court found that the Debtor acknowledged

---

[3] The Debentures are bearing interest at 8% per annum. No shareholder joined in the Petition inasmuch as the Petition was not, in any way, in the interest of the shareholders. On the contrary, the Petition has already caused the shareholders to lose millions of dollars in shareholder value. The stock price fell from approximately $ .25 per share when the Petition was filed to practically nothing.

7

that each petitioner was the holder of a debenture; that the Debtor had every right to conduct discovery; that the Debtor should have raised the issue in the evidentiary <u>motion to dismiss</u> or at trial; and that this was not newly discovered evidence, but that the *alleged error* has existed for several years. (Emphasis added.) [Bankr. 85, TR 9-3-25 at pp. 50-51].

35.    "And, finally - - and this is most critical for purposes of this ruling - - even if there is *some infirmity* with respect to **J. Steven Emerson IRA's** [4] standing as a creditor of Diamondhead, and assuming for purposes of the pending motion he was disqualified, the *alleged infirmity is immaterial* because the petitioning creditors satisfy the statutory requirement for an involuntary petition." (Emphasis added.) [Bankr. 85, TR 9-3-25 at pp. 50-52].

## <u>ARGUMENT</u>

### THE APPELLANT SATISFIES THE STANDARD FOR GRANTING A STAY PENDING APPEAL

36.    The Appellant satisfies the standard for a stay pending appeal. In evaluating the appropriateness for a stay pending appeal, the following factors are considered:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

---

[4]   The confusion is understandable and illustrates the problem. Mr. Emerson was associated with three separate sets of debentures. The six Emerson-related debentures had confusingly similar names. The IRA was <u>not</u> even a Petitioner in the Bankruptcy case. The IRA did not own a debenture. The IRA did not have any assignment of a debenture. The IRA was improperly named the Plaintiff in the District Court case filed in this Court, even though it never owned a debenture or had any assignment of a debenture. The Bankruptcy Court did not seem to understand that the Holder of the Debentures at issue was **Millenium Trust Company, LLC,** not an IRA, and not the largest Petitioner in the Bankruptcy case, *J. Steven Emerson, as Successor to the Steven Emerson Roth IRA.* The **Millenium Trust Company, LLC** is, to this day, the Holder of the debentures at issue. It never sued the Debtor and was not a Petitioner in the Bankruptcy case. Nor did this case involve an "alleged error" or "some infirmity." It involved a fraud on the Court. The largest Petitioner, whose claim was approximately $800,000, had no debentures, no assignment of the Millenium Trust Company, LLC debentures, and no claim.

In *re Revel AC, Inc.*, 802 F.3d 558 (3rd Cir. 2015)(quoting *Hilton v. Braunskill*, 481 U.S. 770, 776(1987)).

37.     The most critical factors are "the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm. *Id.* at 568. Here, each of the four factors weighs in favor of staying proceedings pending resolution of the Debtor's appeal.

**The Likelihood of Success on the Merits**

38.     The determination of the likelihood of success on the merits is a legal decision requiring *de novo* review. A stay applicant in the Third Circuit will demonstrate "a sufficient degree of success for a strong showing" where "there is a reasonable chance, or probability, of winning." *In re Revel*, 802 F.3d at 568-69 (quoting *Singer Mgmt. Consultants, Inc, v. Milgram*, 650 F.3d, 223, 229 (3d Cir. 2011) "[T]he likelihood of winning on appeal need not be more likely than not." *Id.* at 569. (Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%.) *In re Revel*, 802 F.3d at 568-69 *Id.* at 571.

39.     There is a substantial likelihood of success on appeal based on clear errors of fact, unsupported factual findings, procedural errors relating to judicial notice, and a misapplication of governing law, especially with respect to the test for insolvency. In addition, this case involves a fraud on the Court which was excused by the Court because the Debtor failed to challenge the fraud in its motion to dismiss or, at the latest, at the hearing on the motion to dismiss.

40.     The Appellabnt will likely succeed on the merits of its appeal because, in rendering its Opinion, the Bankruptcy Court clearly erred in, but not limited to, the following.

(a)    in finding that the Debtor's September 2024 Form 10-Q "lists the value of its land holdings at $4,691,430," when the Form 10-Q explicitly states that this number represents the "**cost** of land held for development," not the value of its land holdings. (Emphasis added.);

(b)    in taking judicial notice of and relying on the book value of the Debtor's land holdings, an issue in dispute, and relying on book value to conduct an insolvency analysis;

(c)    in taking judicial notice of and relying on the book value of the Company's land holdings, an issue in dispute, instead of the uncontradicted testimony and exhibits introduced by both parties, in determining fair market value of the Company's land holdings;

(d)    in failing to find that the Bankruptcy Court was used by Petitioners for an improper purpose, namely, to circumvent a Land Deed of Trust, which expressly provided for a judicial foreclosure action in Mississippi in the event of a default, identified the procedures to be followed in the event of a default, and specifically named the Mississippi Trustee, who would handle any sale in the event of a default;

(e) in finding, apparently based on the argument of the Petitioners in their answering brief, that the Debtor, in its post-trial Opening Brief, abandoned its argument that the Petition was filed in bad faith because the creditors breached the Land Deed of Trust, when the Debtor's post-trial Opening Brief proves otherwise;

(f)    in finding that "no evidence was presented regarding the Land Deed of Trust" when the Land Deed of Trust was admitted in evidence as Joint Exhibits 8 and 45 of the parties;

(g)    in failing to dismiss the Petition, inasmuch as state law remedies were available for Petitioners to collect their debt, including one in Mississippi, which Petitioners previously agreed to use in the event of any default;

10

(h) in failing to dismiss the Petition, inasmuch as Petitioners admitted it had been filed to collect a debt, an improper bankruptcy purpose, constituting bad faith;

(i) in granting Chapter 7 Relief, which would not serve to maximize the value of any assets of the estate for the Debtor's creditors, but would serve only to diminish them;

(j) in finding that a Chapter 7 was in the better interest of all stakeholders, including the Petitioners, the Debtor, its creditors, its former employees, and its shareholders;

(k) in finding that the payment or accrual of salary, rent, or interest, or the reimbursement of business expenses, was a dissipation of assets;

(l) in finding, if it did, that there was a dissipation of assets of the Debtor, based on a subsidiary's payment of $20,000 to each of two unrelated third-parties, who loaned money to the subsidiary, upon express condition that they be immediately repaid from the proceeds of a potential eminent domain settlement;

(m) in finding that this case involved a corporation with depleting assets when any alleged reduction in assets was due to the payment of ordinary business expenses or obligations, or accounting-related adjustments;

(n) in finding there was some evidence of "dissipation of assets," an issue in dispute, by taking judicial notice of entries in three of the Company's Form 10-Q's from December 31, 2023 through September 30, 2024, which dealt with the legitimate use of cash for normal business operations, the payment of ordinary business expenses or obligations, or accounting-related adjustments;

(o) in finding that a Chapter 7 was necessary in this case when the Debtor was not insolvent;

(p) in finding that the Petition was filed in good faith and that the Petitioners entered the equity court with clean hands when the Petition was filed in retaliation for the Debtor's refusal to

11

comply with Petitioners' unreasonable demands for one hundred percent (100%) of the eminent domain funds which had been awarded to a subsidiary of the Debtor by the Special Court of Eminent Domain, Hancock County, Mississippi, in an eminent domain proceeding;

(q) in failing to dismiss the Petition, given Petitioners' admission that they would <u>not</u> have filed the Bankruptcy Petition had the Debtor agreed to pay $50,000 in additional attorneys' fees, after the Debtor had already agreed to pay $175,000 in attorneys' fees only *sixty-two days earlier* to settle *Arneault, et al. v. Diamondhead Casino Corporation* (In the United States District Court for the District of Delaware)(C.A. No. 1:16-cv-00989-LPS);

(r) in failing to find that the unreasonable demand for more attorneys' fees proves that the Petitioners were not concerned about any payment of preferences or dissipation of assets; that the Petition was not filed in good faith; and that the Petition was filed in retaliation for the Company's refusal to pay even more attorneys' fees;

(s) in finding that the Company did not argue that the timing of the Involuntary Petition was suspicious, when the record proves otherwise;

(t) after denying Debtor' motion to dismiss the Petition, in also denying Debtor the right to convert the case to a Chapter 11, inasmuch as the case had not previously been converted;

(u) in failing to dismiss the Petition or permit the Company to convert to Chapter 11 to resolve important, unsettled issues with respect to two permanent eminent domain easements;

(v) in failing to dismiss the Petition, inasmuch as Petitioners' <u>admitted</u> disregard for the impact the filing of the Petition would have on the publicly traded Company, its stock price, the shareholders, the other creditors, and the Company's former employees, constituted bad faith;

(w) in relying on the mere argument of counsel for Petitioners, where evidence of record was utterly lacking or non-existent;

12

(x)  given the totality of circumstances, in failing to find bad faith **and** dismissing the Petition under 11 U.S.C. §303(a)(1) and 11 U.S.C. §303(i);

(y) in finding that it had jurisdiction over the largest Petitioner, *J. Steven Emerson, as Successor to Steven Emerson Roth IRA*, when this Petitioner was not a debenture holder as claimed, had never sued the Debtor as claimed, was not a judgment creditor as claimed, **had** no assignment of a debenture, and had no valid claim against Debtor;

(z) in refusing to amend its Opinion [D.I. 42] and Order [D.I. 43] to show that the largest Petitioner, *J. Steven Emerson, as Successor to Steven Emerson Roth IRA,* was not a debenture holder, had never sued the Debtor, was not a judgment creditor, had no assignment of a debenture, and had no valid claim against Debtor when the Petition was filed;

(aa) in refusing to amend its Opinion [D.I. 42] and Order  [D.I. 43], **based** on evidence showing that the Petitioners and counsel for Petitioners colluded to **manipulate** diversity jurisdiction and perpetrated a fraud on the United States District Court for the District of Delaware and then used that fraudulently-obtained judgment as grounds to file a Petition in the Bankruptcy Court;

(bb) in allowing Petitioners and counsel for Petitioners to file a Chapter 7 Involuntary Petition based on a fraud on the Court and do so with impunity because the Debtor failed to discover the fraud within twenty-one days of the date of service of the summons on the Debtor or, at the latest, at trial on the motion;

(cc) in finding that the Petitioners and counsel for the Petitioners, who filed a Petition based on a fraud on the Court, nevertheless, came into the Bankruptcy court in good faith and with clean hands because the Debtor failed to discover the fraud within twenty-one days of the date of service of the summons or, at the latest, at trial on the motion;

13

(dd) in finding that the Petitioners and counsel for the Petitioners, who filed a Petition based on a debenture which did not even exist, and who continued to make false statements of fact in pleadings filed with the Bankruptcy Court throughout the case, came into the bankruptcy court in good faith and with clean hands;

(ee) in finding that the Petitioners and counsel for the Petitioners, who knowingly filed a Petition based on a debenture which did not even exist, and whose conduct fell within the scope of bankruptcy fraud as defined by 18 U.S.C. §157, nevertheless, came into the bankruptcy court in good faith and with clean hands;

(ff) in finding that the Petitioners and counsel for the Petitioners, who filed a Declaration in the Bankruptcy Court which falsely claimed that the largest Petitioner, *J. Steven Emerson, as Successor to Steven Emerson Roth IRA*, was the Holder of the two debentures issued to Millenium Trust Company, LLC, when he was not, and that a copy of the debentures were attached as Exhibit B to the Declaration of Petitioner, Edson Arneault, when they were not, came into the bankruptcy court in good faith and with clean hands;

(gg) in allowing the Petitioners and counsel for Petitioners to file a Petition on behalf of the largest Petitioner, *J. Steven Emerson, as Successor to Steven Emerson Roth IRA*, which they knew had no basis in fact, with absolutely no consequences whatsoever;

(hh) in refusing to dismiss the case based on bad faith after learning that the largest Petitioner, *J. Steven Emerson, as Successor to Steven Emerson Roth IRA*, was not a debenture holder, had never sued the Debtor, was not a judgment creditor, had no assignment of a debenture, and had no valid claim against Debtor as claimed;

(ii) in finding that the largest Petitioner, *J. Steven Emerson, as Successor to Steven Emerson Roth IRA*, and counsel for the Petitioner, had filed a Petition in good faith when the Petitioner

violated the express terms of the securities (the debentures) and the Securities Act of 1933, as amended;

(jj)  post-judgment, in failing to grant Debtor's motion for a stay pending a resolution of the appeal given the legal standard applicable to such a determination and given the fraud on the Bankruptcy Court;

(kk) in finding that a fraud on the Bankruptcy Court was governed by Bankruptcy Court Rule 1011(b), which requires that a *responsive* pleading in an involuntary case shall be filed within twenty-one days after service of the summons rather than Rule 60 of the Federal Rules of Civil Procedure which deals with post-judgment relief; and

(ll) in failing to grant the Motion of Deborah A. Vitale for  Leave to Intervene and be Heard in the Above-Captioned Case, pursuant to Federal Rule of Bankruptcy 2018(a).

**The Bankruptcy Court Had No Jurisdiction Over the Largest Petitioner**

41.    Jurisdiction is always in issue, even on appeal. The parties to a case cannot confer jurisdiction on a Court by agreement, by their negligence, or by their failure to detect a fraud.  The Company's failure to detect a fraud does not excuse the bad faith that occurred on the date of the filing of the Petition. Nor does a Company's failure to detect a fraud transform a fraudulent filing into a good faith filing.  The Bankruptcy Court clearly erred in failing to dismiss the Petition after learning it had been filed in bad faith and that the Petitioners and counsel for Petitioners did not have clean hands.

42.    The Bankruptcy Court had no jurisdiction over the largest Petitioner in this case, *J. Steven Emerson as Successor to Steven Emerson Roth IRA*, who had no debenture as claimed, was not a valid assignee of any debenture, had never sued the Debtor as claimed, was not a judgment creditor as claimed, and had no valid claim against the Debtor. Indeed, this Petitioner's claim

15

rested on two debentures issued to another entity, the Millenium Trust Company, LLC, which remains the Holder of two debentures to this date. Petitioners and their counsel repeatedly misrepresented this Petitioner's creditor status to the Court. They filed the Petition in bad faith, based on a claim which they knew was false. Thus, the likelihood of success on the merits, with respect to this single factual issue alone, is strong.[5]

43.        The Petition was filed on June 12, 2024. It was served on the Debtor through the Secretary of State on June 13, 2024. The Petitioners argued that the Debtor had an obligation to detect the fraud within twenty-one days of the service of the summons on the Company, at which time its response was due. This would have been impossible, since copies of the alleged debentures, on which all of the Petitioners' claims rested, were not filed with the Petition at the time it was filed. Moreover, the purpose of the twenty-one day rule is to determine if cases can be promptly decided and Orders for relief entered quickly, not to determine whether a fraud has been perpetrated on a court.

**Debtor and Appellant Will be Irreparably Harmed if a Stay is Not Granted**

44.        A stay applicant must show that "irreparable injury is *likely* … in the absence of a stay." *Id*. at 569. The Third Circuit explained that "for irreparable harm we understand the Supreme Court's use of "likely" to mean more apt to occur than not." *Id*. at 569. A "purely economic injury, compensable in money," constitutes an "irreparable injury … where the potential economic loss is

---

[5]  The Bankruptcy Court declined to grant the motion to amend its Opinion and Order to remove this Petitioner's fraudulent claim. This claim (approximately $800,000), if allowed to stand, would totally distort the creditor pool and apparently requires the Trustee to pay the Petitioner, who falsely claims to hold the same two debentures that are, in fact, held by Millenium Trust Company, LLC.

so great as to threaten the existence of the movant's business*." Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).

45.    The Third Circuit adopted a "sliding-scale approach," in its application of the stay factors whereby "[t]he more likely the [applicant] is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more need it weigh in [its] favor." *Id.* at 569.

46.    The Bankruptcy Court's Order authorizes the immediate liquidation of assets of the estate under Chapter 7. Absent a stay, this appeal will be rendered moot.

47.    The Debtor, which has been in business for over thirty-five years, has two primary assets:

(i)    An approximate 400-acre tract of land on Interstate 10 in Diamondhead, Mississippi owned by a subsidiary of the Company, Mississippi Gaming Corporation. In 2014, after years of litigation, legal, engineering and development work, the Mississippi Gaming Commission awarded Gaming Site Approval to Mississippi Gaming Corporation for a fifty-acre gaming site for a casino on the Property. As a result, the Property is now very valuable and was last appraised in January 2024, at $55.2 million.

(ii)    The Debtor's valuable, public company stock registration with the Securities and Exchange Commission.

48.    A stay is required in this case to halt the liquidation of the Debtor's most valuable asset-its Diamondhead, Mississippi gaming property. Without a stay, liquidation would moot the appeal and permanently transfer assets. Absent a stay, there would be no way for the Debtor to recover its Diamondhead Property, once liquidated.

49.     The economic loss to the Debtor and Debtor's estate is incalculable. The economic loss to the Appellant is equally incalculable. The Appellant has spent decades dealing with federal, state and local governments and agencies to obtain the entitlements needed to build a land-based casino at the Diamondhead, Mississippi site. The Appellant, an environmental attorney and litigator, has spent decades in federal courts in Mississippi and the District of Columbia and in administrative proceedings litigating with environmentalists without charging the estate a penny in legal fees. The Debtor and the Appellant have spent years waiting for environmental impact statements. The Appellant has invested thousands of hours in legal work to obtain the entitlements required to construct a land-based casino resort. Thanks to the Appellant's legal efforts, the Property is now site-approved for a casino and, therefore, extremely valuable. If the Property is sold in an arms-length transaction, all stakeholders, including the Appellant, and all creditors will be paid in full.

50.     However, if the Property is sold at auction in a Chapter 7 liquidation, the Debtor and, in particular, this Appellant, will lose not only their multi-million dollar investment in the property, but also the opportunity to sell it or monetize it in an arms-length transaction, as they were in the process of doing with Colliers International, when the Petition herein was filed. There is no legal or equitable redress for this Appellant or the Debtor herein once the Property is sold. A stay is the only way of protecting this Appellant and the Debtor from harm pending a resolution of the issues in this case.

51.     The damage is already occurring. The Trustee has not even begun to liquidate the Property and, already, potential purchasers and investors who were dealing with the Company in arms' length negotiations are taking advantage of the bankruptcy situation by trying to obtain the Property at bargain basement prices.

52.     Without a stay, the Appellant will be prevented from obtaining a full airing of its issues on appeal and a decision on the merits. The practical effect of the denial of a stay is to resolve the appeal in favor of the Appellees on the merits, since a sale of the Diamondhead Property would moot the appeal.

53.     In April/May of 2024, just weeks prior to the filing of the Petition in the Bankruptcy Court on June 12, 2024, the Diamondhead Property had just been listed for sale at $60 million by Colliers International (Colliers Sales Brochure: Trial Joint Exhibit 25, p. 3). The value of the Property rests on the Mississippi Gaming Commission's award of Gaming Site Approval to a subsidiary of the Debtor, Mississippi Gaming Corporation, which owns the Property.

54.     Mississippi Gaming Site Approval is essential to the value of the Diamondhead Property.   Gaming Site Approval is revocable in Mississippi.   It was awarded to Mississippi Gaming Corporation. It does not run with the property. It may be lost due to a bankruptcy, resulting in a sudden and dramatic decrease in property value.   Moreover, once the Property is sold, the Debtor will lose its valuable gaming rights and this Appellant will lose the financial reward from decades of legal work to obtain the entitlements to construct a land-based casino.

55.     The Debtor's second most valuable asset is its publicly-traded stock and stock registration with the Securities and Exchange Commission. The harm to this Appellant and Debtor is neither speculative nor remote, but actual. Here, irreparable injury is not only likely, it is already occurring. Trading has been halted by some brokerage firms.  It cost the Petitioners a mere $338 to wipe out millions of dollars of shareholder value for approximately 2,000 shareholders and former employees of the Company's stock ownership plan (ESOP). The Debtor's stock price has plummeted from approximately $ .25 per share when the Petition was filed to virtually nothing. The Company has fifty million shares of authorized stock, approximately thirty-six million shares

of stock issued and outstanding, and approximately forty-four million shares of common stock on a fully diluted basis. A stay will halt this diminution pending a decision on the merits.

56.    The Debtor's registration with the Securities and Exchange Commission is at risk. Once lost, it may never be reinstated, threatening a total loss of shareholder value for shareholders and former employees.  It is extremely expensive and time-consuming to take a company public and the pecuniary loss of this registration would be enormous.

57.    The officers and directors of the Company and, in particular, this Appellant, have already suffered damage to their reputations which can only lead to further embarrassment and loss of future employment and opportunities.  Without a full review on the merits, their reputations cannot possibly be restored.

58.    Absent a stay, the Debtor will cease to exist. The Debtor will not only be out of business, but its two primary assets will be lost. This will not only harm the Debtor, it will harm the Debtor's secured creditors, unsecured creditors, its shareholders, and its ESOP employees and, in particular, this Appellant, who is the largest creditor and one of the largest shareholders of the Company.

59.    All stakeholders benefit from a stay pending a resolution of this case on the merits inasmuch as it maintains the status quo, preserves the continued existence of the Debtor, preserves the Debtor's registration status and avoids a distress sale of its Property at an auction.

60.    The harm posed by the absence of a stay to the Debtor substantially outweighs any possible potential harm to the Petitioners who have a first lien on the Property and who are getting eight percent interest on their debentures. The harm to this Appellant and the Debtor is concrete, imminent, already occurring, and will be irreversible without a stay.

**3. A Stay Pending Appeal Will Not Injure Other Parties**

61.      The Third Circuit instructs courts to weigh the likely harm to the movant, absent a stay, against the likely irreparable harm to the stay opponent(s) if the stay is granted. *In re Revel, supra.*, 802 F.3d at 569.

62.      Here, assuming, *arguendo*, each of the Petitioners who filed the Involuntary Chapter 7, for a combined sum of $2,422,500 had a valid claim, they would suffer no irreparable harm, inasmuch as they have a first lien on the Diamondhead Property, last appraised in 2024, at $55.2 million and are accruing interest on their debentures at 8% per annum.[6]

63.      The Petitioners in this case purchased securities (debentures) in a high risk private placement of unregistered securities. Petitioners are all accredited investors. They represented and warranted to the Company when purchasing their debentures that they could absorb the total loss of their investment and that they were willing to hold their debentures indefinitely. The Petitioners hold a first lien on the Diamondhead Property and their interests are in no danger since, as even their own attorney conceded, there is sufficient security to satisfy their debt. Thus, they will continue to collect eight percent interest on their debt since there is more than enough security to pay them in full, together with interest. Therefore, the Petitioners will face no material prejudice from a delay.  Any prejudice will be minimal, namely, a delay.

64.      On September 3, 2025, even the Bankruptcy Court was skeptical about any harm to the creditors. The following colloquy took place between the Court and counsel for the Petitioners:

---

[6] The largest Petitioner in the Bankruptcy case, *J. Steven Emerson, as Successor to the Steven Emerson Roth IRA*, whose claim is for approximately one-third of the total amount claimed by all eight Petitioners, or about $800,000, had no debenture as claimed, had no judgment from this Court as claimed, and had no valid assignment of any debenture. Otherwise put, he had no claim.

The Court: What is the harm to the creditors?

Mr. Stemmerman: Well - -

The Court: Its been 20 years, what is another year?

Mr. Stemmerman: - - It's another $1.2 million in interest or so.

The Court: What is the interest a year?

Mr. Stemmerman: I shouldn't say - - sorry - -

The Court: Its four percent per annum, right? Is that correct under the debentures?

Mr. Stemmerman: Under the debentures it is. It's not just petitioning creditors debentures,
Your Honor, though, there is other debentures as well, there is other loans as well that are
accruing interest. So, all of that is occurring over time.

[Bankr. D.I. 85, TR. 9-3-25, pp. 41-42]

65.     Contrary to Mr. Stemmeran's response, the interest rate on the Petitioners'
debentures was eight percent per annum, not four percent per annum. The total interest was
$120,000 per annum, not $1.2 million per annum. The foregoing is illustrative of counsel's
repeated misrepresentations throughout the case which left the Court with multiple
misimpressions.

66.     In contrast, the Debtor is facing imminent liquidation and the Debtor and this
Appellant, in particular, are facing irreversible harm absent a stay. The Trustee, who was only
appointed on August 1, 2025, is proceeding with extraordinary and wholly unnecessary haste to
simply auction off the Diamondhead Property at the earliest possible time. Indeed, on October 7,
2025, the Trustee filed a motion setting a bid deadline for **January 7, 2025** and an auction date for
January 22, 2026. [Bankr. D.I. 124, at p. 4] This means interested parties will be given virtually

no time to conduct any due diligence, especially given the intervening Thanksgiving Day holidays, Christmas holidays and New Year's.

67.    The Appellant, the ESOP, the shareholders, and the secured and unsecured creditors, many of whom are also shareholders, face <u>imminent</u> and total loss of millions of dollars in property value and millions of dollars in shareholder value. This Court may take judicial notice of the fact that no other creditors of the Company or shareholders of the Company joined in the Petition, although counsel for Petitioners testified that he invited them to do so.

68.    In this case, the remaining secured and unsecured creditors of the Debtor will suffer no irreparable injury if a stay is granted. On the other hand, if a stay is not granted, the Property will be sold at auction in a distress sale.

69.    A stay pending appeal will not injure other parties and may resolve the entire situation. Attached as Exhibit H to the Appellant's Declaration is a letter from General Counsel for the Seminole Tribe of Florida, Inc. This letter was filed as an exhibit in support of the Debtor's motion for a stay below. This entity does not require external financing to consummate a transaction. While due diligence for deals of this type normally takes a great deal of time, General Counsel for the tribe moved extraordinarily fast, given the bankruptcy circumstances here, to conduct his legal, environmental and on-site due diligence. The Seminole Tribe of Florida, Inc. represents the fastest way for Petitioners and other creditors to get paid at virtually no cost to the estate. It would be in the best interest of the Debtor, the Petitioners, and all other stakeholders to permit this gaming entity to resolve this situation so that all stakeholders benefit.

70.    It would be tragic if a thirty-five year old Company were to be put out of business and its shareholders and its former employees were to lose all of their shareholder equity when an

23

obviously financially viable third party is "both able and willing to satisfy the Petitioners' claims in full."

71.     No one's interests are prejudiced by maintaining the status quo, since the estate, consisting primarily of land, remains intact and preserved.

72.     The issuance of a stay will not result in substantial harm to other parties. Thus, the balance of hardships tips sharply in the Appellant's favor.

**4.  Granting a Stay is in the Public Interest**

73.     In evaluating the appropriateness of a stay, courts in the Third Circuit "take into account where the public interest lies-in effect, how a stay decision has consequences beyond the immediate parties." This case has serious ramifications and sets a dangerous precedent.

74.     A stay is not only justified in this case, it is imperative. This Court should not allow a fraud on a Bankruptcy Court to proceed with impunity.  The integrity of the entire bankruptcy system demands intervention and the imposition of a stay pending a full adjudication of the issues on appeal.

75.     A stay in this case benefits all remaining stakeholders. The public interest favors the continuation of the Debtor, the retention of its securities listing, the continuation of shareholder value, and the preservation of the value of its primary asset, its gaming property.

76.     Equally important is that the public interest requires careful appellate review of bankruptcy cases, particularly those in which *involuntary* chapter 7 petitions are granted.  As here, the filing of an Involuntary Chapter 7 Petition can have catastrophic consequences for a small, publicly-traded company and all of its stakeholders. The Debtor, its creditors, its shareholders, its ESOP beneficiaries, and the investing public, are entitled to the correct application of bankruptcy

law in this case and to a meaningful review on the merits. Ensuring proper appellate review is required to protect all stakeholder rights.

77.      A stay in this case is required to review a record which is precedent-setting and which has important ramifications in the real estate development industry, where developments of this magnitude take decades and where the fair market value of a property has never been equated with its book value or the purchase price of the property three decades earlier.

78.      A stay is required to address the Bankruptcy Court's clearly erroneous finding that the market value of a property is its book value, given the serious repercussions such a finding would have in the financial industry, real estate industry, and numerous bankruptcy cases.

79.      Were this a routine case, the foregoing would be sufficient to satisfy this prong of the required analysis.  However, this is not an ordinary case.  It involves a continuing fraud on not one, but two federal courts. The very integrity of the bankruptcy system and two federal courts is at stake.

80.      While judicial resources are stretched, this case truly demands examination. Otherwise, this case will stand for the proposition that a Bankruptcy Petition, based on a blatant fraud will, nonetheless, be deemed to have been filed in *good faith.*  This case actually condones a fraud on the Court. The public interest in punishing and deterring fraud where it surfaces, especially in an <u>involuntary</u> chapter 7 case, warrants a stay pending resolution of an appeal.

81.      The Petitioners' conduct falls within the scope of bankruptcy fraud as defined by 18 U.S.C. §157, which was amended, effective January 2024, <u>before</u> the Petition herein was filed, and explicitly includes "a fraudulent involuntary petition under section 303." (18 U.S.C. §157(1)). The statute applies to any scheme or artifice to defraud using the bankruptcy process to execute the scheme. The statute outlines specific actions that constitute the crime, including making "a

25

false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, **at any time before or after filing of the petition**." (Emphasis added.) Thus, the statute applies regardless of whether the Involuntary Petition has been granted and regardless of whether the petitioners met the technical procedural requirements for filing under Section 303.

82.     This case deals with unregistered securities which cannot be sold, transferred, or assigned, absent an opinion of securities counsel acceptable to the issuer. It involves the improper and invalid "transfer" of a security in violation of the express terms of the instrument and in violation of the Securities Act of 1933 as stated in the debenture itself. The public interest in deterring such violations clearly warrants a stay.

83.     The public interest in this case requires a full airing of the issues on appeal and full transparency since there are precedent-setting issues involved in this case.

84.     The public interest will be served by a stay since a stay preserves the continued existence of the Debtor, preserves shareholder value and corporate assets, prevents irreversible harm before appellate review, avoids premature actions that could moot the appeal, and protects ESOP participants and other stakeholders from avoidable losses.

85.     The appeal now pending in this Court goes to the very integrity of the bankruptcy process and requires careful consideration. In this case, the public interest in preserving trust and confidence in the bankruptcy process is truly of paramount concern.

86.     Incredibly, the Debtor accused counsel for Petitioners and the Petitioners of perpetrating a fraud on two courts-the Bankruptcy Court and *this* Court. In both Courts, the Plaintiff/Petitioners represented to the Court that they held debentures which they did not hold. In both Courts the Plaintiff/Petitioners represented to the Court that certain documents were attached as exhibits to sworn Declarations when the referenced documents did not even exist. The Petitioners do not deny this. They simply blame the Debtor for not detecting the fraud sooner.

87.     The fraud on this Court occurred in *Arneault, et al. v. Diamondhead Casino Corporation* (In the United States District Court for the District of Delaware)(C.A. No. 1:16-cv-00989-LPS). This Court may take judicial notice of the record in this case.

88.     Ironically, it was while trying to get the Petitioners paid in the Bankruptcy Court, that Debtor discovered that Plaintiffs perpetrated a fraud on *this* Court by deliberately excluding the real party in interest, Millenium Trust Company, LLC, Custodian FBO: J. Steven Emerson Roth IRA, as a plaintiff, so as to fabricate jurisdiction in this Court. The presence of the real party in interest, an LLC, would have destroyed complete diversity of citizenship in this Court, rendering any judgment obtained *void ab initio*. (See Vitale Declaration, ¶¶115-119) attached hereto and Exhibit J thereto.) The Petitioners then used the judgment improperly obtained in *this* Court as a basis for filing a Petition in the Bankruptcy Court.

89.     In addition, in *this* Court, Plaintiffs made false statements to this Court as to the existence of an assignment of debentures from the Millenium Trust Company, LLC, when no such assignment existed. They falsely claimed that the assignment was attached to a sworn Declaration filed with *this* Court when no such assignment even existed.

90.     With respect to the Bankruptcy Court, the Debtor discovered that counsel for Petitioners and Petitioners perpetrated a fraud on the Bankruptcy Court by claiming that the largest Petitioner therein, *J. Steven Emerson, as Successor to the Steven Emerson Roth IRA*, held debentures which, in fact, were still held by the Millenium Trust Company, LLC, Custodian FBO: J. Steven Emerson Roth IRA.

91.     On September 3, 2025, during oral argument in the Bankruptcy case, counsel for the Petitioners admitted that the largest Petitioner, *J. Steven Emerson, as Successor to the Steven Emerson Roth IRA*, had no assignment of debentures. He expressly stated as follows:

**There is no assignment from the Roth IRA to Mr. Emerson** in the sense that he was – *he just succeeded* as successor to the Roth IRA. I am not a tax person, so I don't want to mess up how exactly that works, but, again, **it wasn't challenged**.")(Emphasis added.) [Partial Transcript of September 3, 2025, p. 40. Bankr. D.I. 85](Vitale Declaration, Exhibit G).

92.     In the Bankruptcy Court, the Debtor informed the Court that it discovered that the largest Petitioner had no debentures as claimed, no judgment from *this* Court as claimed, no assignment of any debentures, and no valid claim. Counsel's defense was to blame it on the Debtor. Counsel argued that the Debtor was required to challenge the fraud on the Court within twenty-one days of the date of service of the summons on the Debtor. Unfortunately, the Bankruptcy found that the Debtor should have raised the issue in its motion to dismiss, as Petitioners contended, or at trial on the motion. [Bankr. 85, TR. P. 50]

93.     However, that would have been impossible to do. since the Debtor did not discover the fraud until long after the evidentiary trial and long after all briefs had been submitted. In fact, the Debtor was not certain there was no Assignment until the Petitioners filed their Omnibus brief on August 28, 2025 and failed to simply attach a copy of the Assignment as an exhibit to their answering brief. The Petitioners' admission on September 3, 2025 laid all doubts to rest. There was no Assignment and, therefore, the largest Petitioner held no debentures.

## B.  AFFIDAVITS OR OTHER SWORN STATEMENTS SUPPORTING FACTS SUBJECT TO DISPUTE

Attached hereto is the Declaration of Deborah A. Vitale in Support of the Emergency Motion for Stay Pending Appeal of Appellant, Deborah A. Vitale, which addresses facts underlying the emergency motion for a stay, including those facts underlying the claim relating to a fraud on two courts.

## C. RELEVANT PARTS OF THE RECORD

Attached to the Declaration of Deborah A. Vitale are the following exhibits which constitute the relevant parts of the record for purposes of this motion.

Exhibit A:    Millenium Trust Company, LLC Tranche I Debenture

Exhibit B:    Millenium Trust Company, LLC Tranche II Debenture

Exhibit C:    Wurst Demand Letter: 8-17-16

Exhibit D:    Wurst Demand Letter: 2-12-18

Exhibit E:    Vitale Request for Assignment 4-15-25

Exhibit F:    Vitale Request for Assignment 5-1-25

Exhibit G:    Partial Transcript dated September 3, 2025

Exhibit H:    Letter from Seminole Tribe of Florida, Inc.

Exhibit I:    Land Deed of Trust Recorded 9-26-14

Exhibit J:    Docket Sheet Relating to Millenium Trust Company, LLC

## NOTICE OF THIS MOTION

The Movant has given reasonable notice of this motion to all parties.

## CONCLUSION

For the foregoing reasons, the Appellant respectfully requests that the Court enter an Order:

(i)    Granting a stay of the Bankruptcy Court's Order for Relief in an Involuntary Case dated July 31, 2025 [Bankr. D.I. 45] pending resolution of this appeal; and

(ii)    Granting such other relief as the Court deems just and proper.

Respectfully submitted,

Deborah A. Vitale
/s/ Deborah A. Vitale
Appellant, Pro Se
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
email: vitaledav@aol.com

Dated: October 21, 2025