No. 25-01022-MN
No. 25-01167-MN

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---

IN RE:   DIAMONDHEAD CASINO CORPORATION,

DEBTOR.

DEBORAH A. VITALE,

APPELLANT,

v.

EDSON ARNEAULT, ET AL.,

APPELLEES.

---

## ON APPEAL FROM THE UNITED STATES BANKRUTPCY COURT
## FOR THHE DISTRICT OF DELAWARE

**Bankruptcy Case No. 24-11354 (JKS)(Chapter 7)**

---

### APPELLANT'S OPENING BRIEF

---

Deborah A. Vitale
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
Email: vitaledav@aol.com
*Appellant Pro Se*

Dated: January 22, 2026

i

## CORPORATE DISCLOSURE STATEMENT

The Appellant, pursuant to Federal Rule of Bankruptcy Procedure 8012(b), submits the following Disclosure Statement relating to the Debtor, Diamondhead Casino Corporation, pursuant to Federal Rule of Bankruptcy Procedure 8012(a).

The Debtor has no parent corporation and no publicly held corporation which owns ten percent (10%) or more of the Debtor's stock.

/s/ Deborah A. Vitale
Deborah A. Vitale
*Appellant, Pro Se*
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
Email: vitaledav@aol.com

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT………………………    ii

TABLE OF CONTENTS……………………………………………    iii

TABLE OF CITATIONS AND AUTHORITIES ...………………    iv

I.      JURISDICTIONAL STATEMENT……..…………………..    1

II.     STATEMENT OF ISSUES ON APPEAL ………………….    1

III.    STATEMENT OF THE CASE …….……………………………  5

IV.     SUMMARY OF ARGUMENT ..…………………………………  8

V.      STANDARD OF REVIEW …………………………………..  11

**ARGUMENT** ……………………………………..…………..…  12

I.      THE BANKRUPTCY COURT LACKED SUBJECT MATTER
        JURISDICTION BECAUSE THE JUDGMENT ON WHICH ALL
        PETITIONERS    RELIED    WAS    VOID    AB    INITIO
        …………………………………………………………………  12

II.     THE BANKRUPTCY COURT CLEARLY ERRED IN TAKING
        JUDICIAL NOTICE OF THE ALLEGED VALUE OF DEBTOR'S
        LAND HOLDINGS……………………………………………  15

III.    THE    BANKRUPTCY    COURT    CLEARLY    ERRED    IN
        SUBSTITUTING    COST    FOR    THE    UNCONTROVERTED
        VALUATION EVIDENCE ……………………………………  20

IV.     THE BANKRUPTCY COURT ERRED IN FAILING TO DISMISS
        THE  INVOLUNTARY  PETITION  BECAUSE  PETITIONERS
        HAD ADEQUATE STATE-LAW REMEDIES ……………… 26

V.      THE BANKRUPTCY COURT ERRED IN FAILING TO DISMISS
        THE INVOLUNTARY PETITION INASMUCH AS PETITIONERS
        DID NOT ACT IN GOOD FAITH AND DID NOT COME INTO
        COURT WITH CLEAN HANDS …..……………………………… 30

VI.    THE COURT ERRED IN GRANTING CHAPTER 7 RELIEF
       BECAUSE LIQUIDATION WAS NOT IN THE BEST INTERESTS
       OF CREDITORS OR THE ESTATE ……………………………….. 36

VII.   THE BANKRUPTCY COURT CLEARY ERRED IN FINDING
       THERE WAS A DISSIPATION OF ASSETS ………………….. 40

VIII.  THE BANKRUTPCY COURT ERRED IN DENYING
       CONVERSION TO CHAPTER 11 ……………………………… 46


CONCLUSION …………………..……………..…….………....………… 49

CERTIFICATE OF COMPLIANCE ..………………..………………… 52

CERTIFICATE OF SERVICE ………………………………………….. 53

## **TABLE OF CITATIONS AND AUTHORITIES**

### **Cases**

*American Flint Glass Workers Union v. Anchor Resolution Corp.,*
   197 F.3d 76 (3d Cir. 1999) ……………………………………   11

*In re Canon Express Corp.,*
   280 B.R. 450, 455-56 (Bankr.W.D. Ark. 2002) ……………………   33

*In re Century Tile Marble, Inc.,*
   152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) ……………………   31

*In re Engel,*
   124 F.3d 567 (3d Cir. 1997) ……………………………………   11

*In re Forever Green Athletic Fields, Inc.,*
   804 F.3d 328, 334 (3d Cir. 2015) …………………………………   Passim

*In re Forever Green Athletic Fields, Inc.,*
   500 B.R. 413, 428 (Bankr. E.D. Pa. 2013) ……………………………33, 36

*In re Heritage Highgate, Inc.,*
   689 F.3d 132 (3d Cir. 2012) ……………………………………   16

*In re Montgomery Ward Holding Corp.,*
   326 F.3d 383 (3d Cir. 2003) ……………………………………   11

*In re Mountain Dairies, Inc.,*
   372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007) …………………………   31

*In re Nordbrock,*
   772 F.2d 397, 400 (8th Cir. 1985) …………………………………   29

*In re Tichey Elec. Co., Inc.,*
   332 B.R. 364, 374 (Bankr,. N.D. Iowa 2005) ………………………..   29

*In re QDN LLC,*
   363 F. App'x 873 (3d Cir. 2010) …………………………………   13

*In re Tamecki,*
    229 3d 205 (3d Cir. 2000) ………………………………………….. 12, 26

*In re Trans World Airlines, Inc.,*
    145 F.3d 124, 130-31 (3rd Cir. 1998)………………………………    11

*Lightning Lube, Inc. v. Witco Corp.,*
    4 F.3d 1153 (3d Cir. 1993) ..………………………………………    21

*Marrama v. Citizens Bank of Massachusetts,*
    549 U.S. 365, 372-74 (2007) …………………………………….    44

*Oran v. Stafford,*
    226 F.3d 275, 289 (3d Cir. 2000)………………………………….    17

*Roemer v. Board of Public Works of Maryland,* 4
    426 U.S. 736, 742 (1976) …………………………………………    35

## Statutes

28 U.S.C. §158(a)(1)(a) ..…………………………………………….    1
11 U.S.C. §109 (b) …………………………………………………    44
11 U.S.C. §109(d) …………………………………………………    44
11 U.S.C. §303(a)(1) ………………………………………………    27
11 U.S.C. §303(i)……………………………………………………    27
11 U.S.C. §706(a) ………………………………………………....  43-46
11 U.S.C. §1112 …………………………………………………… 45-46

## Rules

Fed. R. Bankr. P. 8002(a)(1) ………………………………………    1
Fed. R. Bankr. P. 8012(a), 8012(b) ………………………………..    ii
Fed. R. Evid. 201(b), 201(e) ……………………………………… Passim

## I.    JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §158(a)(1) which provides that District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." This is an appeal from an Order for Relief in an Involuntary Case entered in the United States Bankruptcy Court for the District of Delaware on July 31, 2025, which is a final Order. On August 13, 2023, less than fourteen days from the date of the Order, the Appellant filed a timely Notice of Appeal, pursuant to Federal Rule of Bankruptcy Procedure 8002(a)(1).

This is also an appeal from the subsequent Order of the Bankruptcy Court entered on September 4, 2025, Denying Motions Filed at D.I. Nos. 47, 55 and 63 [Bankr. D.I. 89]. On September 17, 2025, less than fourteen days from the date of the Order, Appellant filed a timely Notice of Appeal, pursuant to Federal Rule of Bankruptcy Procedure 8002(a)(1), adding this Order to the Orders of the Bankruptcy Court previously appealed from in the Appellant's prior Notice of Appeal,

## II.    STATEMENT OF ISSUES PRESENTED

### 1.  Lack of Subject-Matter Jurisdiction

Whether the Bankruptcy Court lacked subject-matter jurisdiction to enter an Order for Relief where all eight Petitioning Creditors relied on a judgment that was void *ab initio* for lack of subject-matter jurisdiction.

**2.  Improper Judicial Notice of Land Value**

Whether the Bankruptcy Court clearly erred in taking judicial notice of the "value" of Debtor's land, based on a Form 10-Q, which reported cost, not market value.

**3.  Erroneous Equating of 1993 Cost With 2024 Market Value**

Whether the Bankruptcy Court committed reversible error by equating the 1993 cost of the Debtor's Property with its 2024 market value, contrary to §506(a) and controlling Third Circuit precedent, which requires that valuation be based on fair market value.

**4.  Judicial Notice of "Land Value" Without an Opportunity to be Heard**

Whether the Bankruptcy Court erred in taking judicial notice, in its written Opinion, in violation of Fed. R. Evid. 201(b) and (e), of the "value" of Debtor's land without affording Debtor an opportunity to be heard on the issue.

**5.  Failure to Dismiss Petition Where Adequate State-Law Remedies Were Available**

Whether the Bankruptcy Court clearly erred: (1) in finding that the Land Deed of Trust was not in evidence; (2) in concluding that the Debtor abandoned arguments relating to the Land Deed of Trust; and (3) in failing to dismiss the Petition since Petitioners had adequate state-law remedies available to collect their judgment.

**6.  Circumvention of the Land Deed of Trust**

Whether the Bankruptcy Court erred in failing to find that Petitioners used the involuntary bankruptcy process for an improper purpose, namely, to circumvent the

Land Deed of Trust, which expressly provided for a judicial foreclosure action in
<u>Mississippi</u> in the event of a default, identified the procedures to be followed in the
event of a default, and specifically designated the Mississippi Trustee, who would
handle any sale in the event of a default.

**7. Failure to Dismiss the Involuntary Petition for Bad faith**

Whether the Bankruptcy Court erred in refusing to dismiss the Involuntary Petition
where:

    (i)     state law remedies were available for Petitioners to collect their debt;

    (ii)    Petitioners admitted the Petition was filed to collect a debt;

    (iii)   Petitioners admitted they would not have filed the Petition had the
            Debtor agreed to pay additional attorneys' fees;

    (iv)   Petitioners' knew the Debtor had already placed the Property on the
            market for sale;

    (v)    a Chapter 7 served no legitimate bankruptcy purpose; and

    (vi)   the totality of circumstances demonstrated bad faith under 11 U.S.C.
            §§303(a)(1) and 303(i).

**8. Whether the Bankruptcy Court erred in finding that Petitioners acted in
good faith and with clean hands, despite:**

(a) filing a Petition based on a judgment obtained by fabricating subject-
matter jurisdiction in a federal court, by deliberately excluding the real party
in interest whose inclusion would have destroyed diversity of citizenship;

(b) filing a Petition in which they falsely claimed that the largest Petitioner was the holder of the two largest debentures held by Petitioners, when Petitioners' own exhibits showed that the two largest debentures were still held by the same limited liability company deliberately excluded as a plaintiff in the federal court to manufacture diversity jurisdiction;

(c) falsely claiming that copies of each of the Petitioners' debentures were attached as exhibits to a Declaration when no debentures even existed for the largest Petitioner; and

(d) falsely claiming that each Petitioner held a judgment from the federal court when the largest Petitioner was not even named as a Plaintiff in the federal court case.

9. **Failure to Dismiss the Petition Since Liquidation Was Not in the Best Interest of Creditors or the Estate**

Whether the bankruptcy Court erred in granting Chapter 7 Relief and in failing to dismiss the Petition since liquidation was not in the best interest of creditors or the estate and would not serve to maximize recovery for the creditors.

10. **Judicial Notice of Form 10-Q Entries to Infer "Dissipation of Assets"**

Whether the Bankruptcy Court erred in taking judicial notice, in its written Opinion, in violation of Fed. R. Evid. 201(b) and (e), of entries in three Form 10-Q filings, to infer "dissipation of assets," without affording Debtor an opportunity to be heard on the issue.

**11.  Lack of Dissipation of Assets as a Matter of Fact and of Law**

Whether the Bankruptcy Court clearly erred in finding a "dissipation of assets" where the Debtor's expenditures were for ordinary business expenses which, as a matter of law, do not constitute a "dissipation of assets."

**12.  Denial of Conversion to Chapter 11**

Whether the Bankruptcy Court erred in denying Debtor the right to convert the case to a Chapter 11, where the case had not previously been converted, and where there was no finding of bad faith on the part of the Debtor.

**STATEMENT OF THE CASE**

This appeal arises from the Bankruptcy Court's entry of an Order for Relief in an Involuntary Chapter 7 case filed against Diamondhead Casino Corporation. The Debtor moved to dismiss the Involuntary Petition or, alternatively, to convert the case to Chapter 11. The Bankruptcy Court denied the motion, entered an Order for Relief, denied Appellant's motion to intervene, and later denied, or declined to consider, post-judgment motions on the ground that the issues were already on appeal to this Court.

**Procedural Background**

1.      On June 12, 2024, the Petitioning Creditors filed an Involuntary Chapter 7 Petition against Diamondhead Casino Corporation. [Bankr. D.I. 1].

2.    On July 18, 2024, the Debtor filed a Motion to Dismiss the Involuntary Petition or, in the Alternative, to Convert the Case to a Chapter 11. [Bankr. D.I. 9]. On September 3, 2024, the Petitioners filed an Opposition to the foregoing Motion. [Bankr. D.I. 11].

3.    On December 5, 2024 and January 16, 2025, the Bankruptcy Court held hearings on the motion. [Bankr. D.I. 25 and 32]  The parties submitted post-trial briefs. [D.I. 38-40]

4.    On July 30, 2025, the Court issued an Opinion and Order underdenying the Debtor's Motion to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11. [Bankr. D.I. 42, 43]

5.    On July 31, 2025, the Court entered an Order for Relief in an Involuntary Case. [Bankr. D.I. 45] (the "Chapter 7 Order"). On August 1, 2025, the Court appointed an Interim Trustee. [Bankr. D.I. 46]

6.    On August 13, 2025, Debtor and Appellant filed motions for a stay pending appeal and a motion to vacate or amend the Court's July 30 Opinion and Order. [Bankr. D.I. 47, 55, 63]. Petitioners filed an omnibus objection on August 28, 2025. [Bankr. D.I. 77]

7.    On September 3, 2025, the Bankruptcy Court heard argument on the motion for a stay and denied the motion. The Court also denied the remaining motions, concluding that it lacked authority to consider them because the issues were

already on appeal. [Bankr. D.I. 85, TR. 9-3-25, at p. 92] On September 4, 2025, the Court entered an Order denying the motions at D.I. Nos. 47, 55 and 63 [Bankr. D.I. 89].

8.     On August 13, 2025, Appellant filed a timely Notice of Appeal. [Bankr. D.I. 57]. On August 27, 2025, the Appellant filed a Designation of Items for Inclusion in the Record on Appeal and a Statement of the Issues on Appeal [01022-D.I. 4-5].[1]

9.     On September 17, 2025, Appellant filed a Notice of Appeal adding the Order entered by the Bankruptcy Court on September 4, 2025 to the Orders of the previously appealed from. [01167- D.I. 1] On September 18, 2025, the Appellant filed a Designation of Items for Inclusion in the Record on Appeal and a Statement of the Issues on Appeal. [01167-D.I. 4-5].

10.    On October 21, 2025, Appellant filed an Emergency Motion for Stay Pending Appeal in this Court. Petitioners filed an Opposition. On December 3, 2025, the Court denied Appellant's Emergency Motion for Stay Pending Appeal.

---

[1] The Appellant filed an original Notice of Appeal from Orders then-entered by the Bankruptcy Court (Case No. 1:25-cv-01022-MN) and a second Notice of Appeal (Case No. 1:25-cv-01167-MN), which included the Orders originally appealed from and subsequent Orders of the Court issued on September 4, 2025. References to the docket in these two cases will be to 01022-D.I. or 01167-D.I.)

## SUMMARY OF ARGUMENT

The threshold argument is that the Bankruptcy Court lacked subject-matter jurisdiction to enter an Order for Relief since all eight Petitioning Creditors relied on a judgment that was void *ab initio* for lack of subject-matter jurisdiction. A void judgment cannot support another Court's exercise of jurisdiction. The Bankruptcy Court treated the matter as one involving a mere "infirmity" which affected only one Petitioner and, therefore, failed to address the issue on the merits. The issue is outcome determinative in this case and the Bankruptcy case.

The Bankruptcy Court ignored all of the undisputed testimonial and documentary evidence presented at trial as to valuation of the Debtor's property. Instead, the Bankruptcy Court took judicial notice in its Opinion, without notice to the parties, in violation of Fed. R. Evid. 201, of an entry in the Debtor's Form 10-Q. The Court clearly misread the entry, which reported "cost" of the land purchased in 1993, and interpreted it as the "value" of the land in 2024. This clear error infected all of its subsequent findings and conclusions. The Court erred in taking judicial notice of such a matter, doing so in its Opinion, rendered long after the close of the record, and then misreading the alleged "fact."

The Bankruptcy Court erred in failing to recognize that the Petitioners had adequate state-law remedies available to collect their judgment, including one they agreed to use in the Land Deed of Trust, which expressly provides for "a judicial

foreclosure action" in <u>Mississippi</u> in the event of a default, identifies the procedures to be followed to sell the Property in the event of a default, and specifically names the Trustee, a Mississippi attorney, who would handle any sale in the event of a default. The Debtor maintains that Petitioners were using the Bankruptcy Court in bad faith, to collect a debt, an improper bankruptcy purpose, and to circumvent the Land Deed of Trust.

The Bankruptcy Court erred in failing to dismiss the Petition for bad faith. The evidence showed Petitioners used the threat of bankruptcy as leverage and counsel for Petitioners testified they would <u>not</u> have even filed the Petition had they been able to extract an additional $50,000 in attorneys' fees from the Debtor. This, only sixty-two days after the Debtor had just agreed to pay $175,000 to settle the Collection Case he filed against the Debtor.  This, and other evidence, showed that the Petitioners were not concerned about any dissipation of assets and were more than willing to wait for their money, provided they could extract additional attorneys' fees from Debtor.

There was no evidence of record of any dissipation of assets. The Bankruptcy Court concluded there was a dissipation of assets because it took judicial notice of entries in three Form 10-Q's, which the Court wrongly interpreted as showing assets decreasing and liabilities increasing.  Even assuming, *arguendo*, this were accurate, it would still not constitute a dissipation of assets, as a matter of law. Again, the

Court erred in taking judicial notice, without notice to the parties and, in violation of Fed. R. Evid. 201, of entries in three of the Debtor's Form 10-Q's. In finding that liabilities were increasing, the Court treated the payment or accrual of salary, rent, interest, and expenses, as dissipation. This was incorrect as a matter of law. Even in distressed companies, the payment or accrual of ordinary business expenses, including salary, rent, interest, and expenses, is not, as a matter of law, a dissipation of assets.

The Bankruptcy Court erred in denying the Debtor its right to convert the case to Chapter 11. A Debtor is entitled to a one-time right to convert to Chapter 11, absent a finding of bad faith. The Court made no finding of bad faith, thus the Debtor had a right to convert. Conversion, rather than liquidation, made sense for all creditors because of outstanding eminent domain issues and the risk of loss in a liquidation of the Debtor's most valuable entitlement, Mississippi Gaming Site Approval, which was revocable.

The Bankruptcy Court's finding that Petitioners came into Court with clean hands and in good faith cannot stand. The record reflects that Petitioners deliberately excluded the real party in interest in the Collection Case, a limited liability company, so as to fabricate subject-matter jurisdiction, and then used the judgment procured by doing so to file the Bankruptcy Petition. Petitioners then falsely represented to the Bankruptcy Court that the largest Petitioner was the holder of the two largest

10

debentures, when their own exhibits showed that the debentures were still owned by the same limited liability company deliberately excluded as a Plaintiff in the Collection Case. Contrary to Petitioners' claims, the largest Petitioner was not a holder of any debentures, had no judgment against Debtor, had no assignment of any debentures, and had no claim against Debtor.

The Bankruptcy Court's Order for Relief must be vacated since it rests on a null and void judgment and findings of fact and conclusions of law that are clearly erroneous.

### <u>STANDARD OF REVIEW</u>

When reviewing a bankruptcy court's decision, the district court applies a tiered standard of review.

1. Legal conclusions are reviewed *de novo*, with no deference to the bankruptcy court's analysis or interpretation of statutes or precedent. *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

2. Findings of fact are reviewed for clear error and must be reversed where a reviewing court is "left with the definite and firm conviction that a mistake has been committed." *In re Engel*, 124 F.3d 567, 571 (3d Cir 1997).

3. A bankruptcy court's discretionary rulings are reviewed for abuse of discretion. *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130-31 (3rd Cir. 1998).

4.  Mixed questions of law and fact must be broken down and reviewed under the applicable standard.  *In re Montgomery Ward Holding Corp.*, 326 F.3d 383, 387 (3d Cir. 2003).

5. Critical in this case, is that "[o]nce a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith. *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).

The District Court may affirm, reverse, modify, or remand the bankruptcy court's order as justice requires. Where, as here, the bankruptcy court has exceeded its statutory authority, misapplied controlling precedent, or entered findings unsupported by the record, reversal or vacatur is warranted.

**ARGUMENT**

I.    **THE BANKRUPTCY COURT LACKED SUBJECT MATTER JURISDICTION BECAUSE THE JUDGMENT ON WHICH ALL PETITIONERS RELIED WAS VOID AB INITIO**

The Chapter 7 Involuntary Petition filed against Diamondhead Casino Corporation was predicated on the judgment entered in *Arneault, et al, v. Diamondhead Casino Corporation,* C.A. No. 1:16-cv-00989-LPS (D. Del. 2016) ("the Collection Case").  Petitioners repeatedly represented to the Bankruptcy Court

12

that they were entitled to file their petition under §303(b) because they had a judgment against the Debtor. (Bankr. D.I. 36. Tr. 1-16-25, at pp. 112-113). Their eligibility rises or falls with that judgment.

A judgment entered without subject-matter jurisdiction is void *ab initio* under Fed. R. Civ. P. 60(b)(4). A void judgment is a legal nullity and cannot support or create subject matter jurisdiction in a Bankruptcy Court. Because all eight Petitioning Creditors relied on the same void judgment, the Bankruptcy Court lacked statutory authority to enter an Order for Relief.

## A.   The Bankruptcy Court Mischaracterized the Jurisdictional Defect as a Mere "Infirmity"

The Bankruptcy Court did not address Appellant's jurisdictional challenge on the merits. Instead, adopting Petitioners' framing, the Court treated the issue as an "infirmity" relating to the identity of one Petitioner. It concluded that even if the IRA were disqualified, seven Petitioners remained to satisfy the statute's jurisdictional requirements. This was clear error.

The issue was not an "infirmity," or misnomer, relating to a single Petitioner. It was subject-matter jurisdiction. All eight Petitioners relied on the same judgment from the same Court. If the judgment was void, none of the Petitioners had a qualifying claim under §303(b) and the Bankruptcy Court lacked subject-matter jurisdiction to enter an Order for Relief.

13

## B.  Federal Courts Must Address Subject-Matter Jurisdiction Sua Sponte

Federal courts have an affirmative obligation to examine subject matter jurisdiction whenever the issue arises *sua sponte*. *In re QDN LLC*, 363 F. App'x 873 (3d Cir. 2010).  The failure to do so is reversible error.

This duty does not depend on whether a party raises the issue, whether a Trustee prefers not to pursue it, or whether the defect is discovered late in the proceedings or thereafter. A court must ensure that jurisdiction existed at the time the action was filed.  Subject-matter jurisdiction cannot be conferred on a court by the parties, by consent or otherwise, or cured retroactively.  The Bankruptcy Court's failure to address the jurisdictional defect after it was raised was reversible error.

## C.  The District Court Lacked Subject Matter Jurisdiction in the Collection Case, Rendering the Judgment Void

On November 12, 2025, Appellant filed a Motion to Reopen Action, Vacate Judgment, and Dismiss Action in *Arneault, et al, v. Diamondhead Casino Corporation* (C.A. No. 1:16-cv-00989-LPS)(D. Del. 2016)("the Collection Case") for lack of subject-matter jurisdiction, supported by a detailed Memorandum of Law, exhibits, and a sworn Declaration. [D.I. 80, 80-1, 80-2].  These filings demonstrate that diversity jurisdiction was fabricated by deliberately excluding the real party in interest, a limited liability company, whose inclusion would have destroyed diversity.

On November 21, 2025, the Trustee filed a motion to strike based on Appellant's alleged lack of standing. [D.I. 83] On November 25, 2025, Petitioners filed an Opposition. [D.I. 84]. Appellant filed a Reply to Petitioners' Opposition [D.I. 89] and an Opposition to the Trustee's motion to strike [D.I. 90].

The matter has been fully briefed. Appellant has expressly requested that this Court review the jurisdictional issue, *sua sponte*, if necessary. Inasmuch as this Court is presiding over both cases, the facts and arguments will not be repeated here. Appellant incorporates those jurisdictional facts and arguments to establish that the judgment on which all Petitioners relied was a nullity.

Because the District Court lacked subject-matter jurisdiction in the Collection Case, the judgment is void *ab initio*. A null and void judgment cannot be used to support subject-matter jurisdiction in the Bankruptcy Case. Thus, the Bankruptcy Court lacked subject-matter jurisdiction to enter an Order for Relief.

## II.    THE BANKRUPTCY COURT CLEARLY ERRED IN TAKING JUDICIAL NOTICE OF THE ALLEGED VALUE OF DEBTOR'S LAND HOLDINGS

The Bankruptcy Court's decision to enter an Order for Relief rests on a factual premise that does not exist. The Bankruptcy Court (1) misread the Debtor's Form 10-Q, (2) equated 1993 cost of the Property with its 2024 fair market value, and (3) took judicial notice of a supposed "value" that was neither reported, nor capable of accurate determination, under Fed. R. Evid. 201. Each error independently warrants

15

reversal. Together, they fatally undermine the Court's insolvency analysis and its conclusion that a Chapter 7 liquidation was warranted.

**A.  The Bankruptcy Court Misread the Debtor's Form 10-Q**

The Bankruptcy found that the Debtor "lists **the value of its land holdings** at $4,691,430." (Emphasis added.)[Bankr. Opinion, D.I. 42, p. 5] This finding is clearly erroneous. The Form 10-Q does **not** report the value of the Debtor's land holdings. The Form 10-Q expressly states as follows:

"Land held for development is carried at <u>**cost**</u>."

(Form 10-Q: September 30, 2024, at p. 7)[Bankr. Ex. 32](Emphasis added).

Publicly-traded companies in the United States, such as the Debtor follow Generally Accepted Accounting Principles ("GAAP") when filing financial reports with the Securities and Exchange Commission ("SEC"). Publicly traded companies report land at historical cost, not market value. Upward revaluations are not permitted under GAAP. Land purchased in 1993 and held for decades is commonly known to be grossly understated. Thus, the Bankruptcy Court's reliance on cost as "value" was factually incorrect and based on an improper use of judicial notice.

**B.  The Bankruptcy Court Clearly Erred in Equating 1993 Cost With 2024 Market Value**

The Bankruptcy Court committed reversible error by equating the 1993 cost of the Debtor's Property with its 2024 market value. Section 506(a) and controlling Third Circuit precedent require that valuation be based on fair market value. The

16

Debtor's Diamondhead Property was purchased in 1993. The Bankruptcy Court treated the 1993 cost figure as if it represented the Property's 2024 fair market value. This was reversible error.

Section 506(a) and controlling Third Circuit precedent require valuation based on fair market value, not historical cost. *In re Heritage Highgate, Inc.*, 689 F.3d 132, 142 (3d Cir. 2012). The Bankruptcy Court's substitution of cost for value ignored: (1) over three decades of market appreciation; (2) the Property's unique zoning and gaming entitlements obtained long after the Property was purchased; (3) uncontroverted evidence that the Property was actively being marketed at $60 million by a reputable international firm; and (4) uncontroverted evidence that offers had been received for a minimum of $1 million per acre for site-approved gaming property.

By equating cost with value, the Bankruptcy Court applied an incorrect legal standard and reached a materially erroneous factual conclusion. It wrongly concluded that the Debtor's liabilities exceeded its assets when the Debtor's assets, based on fair market value, clearly exceeded its liabilities. Thus, its resulting insolvency analysis is erroneous and its Order for Relief must be vacated.

**C. The Bankruptcy Court Improperly Took Judicial Notice of a "Value" Not Subject to Judicial Notice Under Rule 201**

A Bankruptcy Court <u>may</u> take judicial notice of a Company's Securities and Exchange Commission ("SEC") filings. *Oran v. Stafford*, 226, F.3d 275, 289 (3d Cir.

2000). Fed. R. Evid. 201 allows a court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

The value of the Debtor's land in Diamondhead, <u>Mississippi</u> is not "generally known within the trial court's territorial jurisdiction" which is Delaware. Nor could it be accurately and readily determined from the Company's Form 10-Q for September 30, 2024, since the Form 10-Q did not report the value of the Debtor's land holdings. It reported the <u>cost</u> of land. The value of the Debtor's land holdings was not capable of accurate determination based on any SEC filing, since it was not reported in the Debtor's SEC filings.

The Form 10-Q reports **cost**, not value. Cost is <u>not</u> a proxy for market value and certainly not a fact "not subject to reasonable dispute." The Bankruptcy Court therefore erred in taking judicial notice of an alleged "value" that was neither stated nor ascertainable from the Form 10-Q.

### D. The Bankruptcy Court Violated Rule 201(c) by Taking Judicial Notice in Its Written Opinion Without Providing an Opportunity to be Heard

Federal Rule of Evidence 201(e) entitles a party "to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." The Bankruptcy Court took judicial notice of this dispositive fact, for the first time, in its written Opinion, rendered long after the record had closed. This deprived the Debtor of any

18

opportunity to challenge the propriety of taking judicial notice, the nature of the fact to be noticed, the accuracy of the fact to be judicially noticed, and the Court's clear misreading of the Form 10-Q.

The Bankruptcy Court's obvious error would have been avoided had the Debtor been notified of the Court's intent to take judicial notice. In bypassing the evidentiary process and taking judicial notice in its Opinion, the Court denied the Debtor a meaningful opportunity to challenge the Court's finding. The procedural shortcut violated Rule 201 and clearly resulted in reversible error.

## E. The Erroneous Judicially-Noticed "Value" Tainted the Court's Insolvency Analysis and Its Decision to Enter an Order for Relief

The Bankruptcy Court's reliance on the $4.69 million cost figure permeated its analysis of (1) the value of the Debtor's assets; (2) the Debtor's alleged insolvency; (3) the necessity for a Chapter 7 liquidation; and (4) the overall condition of the estate. By treating cost as current market value in 2024, the Bankruptcy Court wrongly concluded that the Debtor's liabilities exceeded its assets and that, therefore, the Debtor was insolvent. In fact, the reverse was true. The Debtor's assets, when measured at fair market value, plainly exceeded its liabilities and, therefore, the Debtor was <u>not</u> insolvent.  The Court made a clearly erroneous factual finding, based on its improper use of judicial notice, that directly led to its incorrect insolvency analysis.  The resulting Order for Relief, which rests on a clearly erroneous factual foundation, requires vacatur.

19

### III.    THE BANKRUPTCY COURT CLEARLY ERRED IN SUBSTITUTING COST FOR THE UNCONTROVERTED VALUATION EVIDENCE

The Bankruptcy Court's valuation was clearly erroneous. The Bankruptcy Court disregarded every piece of valuation evidence in the record. In relying on cost, instead of fair market value, the court substituted its own opinion for uncontradicted evidence presented at trial. The Court completely ignored the uncontradicted <u>testimony</u> presented at trial. It completely ignored the uncontradicted <u>documentary</u> evidence of valuation introduced in <u>joint</u> exhibits of both parties at trial. The Bankruptcy Court erred in doing so. The magnitude of the Court's error is underscored by the vast disparity between the Court's cost-based valuation and the evidence of fair-market valuation presented at trial.

### A. The Undisputed Testimonial Evidence Established a Fair Market Value of a Minimum of $40 Million

The undisputed *testimonial* evidence presented established a market value for the entire Diamondhead property of between $40 and $60 million. Every witness who testified, including independent professionals, and the Debtor's officers, provided consistent, unchallenged evidence, that the Property's fair market value was between $40 and $60 million.

### 1.    Colliers Internation Placed the Property on the Market at $60 Million

The Vice President of Colliers International testified that, after completing its extensive investigation of the property, Colliers International put the Property on the

market for sale at $60 million in April/May 2024. [Bankr. D.I. 27, TR I: p.19, lines:18-20].

The Debtor introduced **Joint** Exhibit 25, the Colliers Brochure entitled: "Casino Development Land for Sale." It states at page 3: "Colliers is pleased to present this land for a casino development at $60,000,000." The Petitioners did not object to this exhibit.

### 2.    The Debtor's CEO Testified That the Gaming-Entitled Acreage was Worth $1 Million Per Acre

Appellant, the Debtor's President and CEO, based on decades of development experience in Mississippi, who was responsible for securing all entitlements for the gaming site, testified that the Company's "casino property [the fifty-acre site approved for a casino] is a million an acre. There's no doubt about that." [Bankr. D.I. 27, TRI: p. 116, lines 11-13]. No witness contradicted this testimony. The testimony was confirmed by documentary evidence, namely, Joint Exhibit 64. Appellant also testified that no one ever questioned the appraised value of the Property.

### 3.    The Debtor's Chairman Testified to Offers Between $40 Million and $50 Million

Mr. Harrison, the Debtor's Chairman of the Board, testified that the Company had a Letter of Intent from a group that offered $40 million "[t]o buy the land." [Bankr. D.I. 27, TRI: p. 72, lines 1-3] and that "[p]roof of funds has been satisfied." [Bankr. D.I. 27, TRI: p. 71, lines 10-16]. He testified that Ms. Vitale was on her

seventh draft of a purchase agreement for a $50 million deal ("the Bruce" deal) which ended when the involuntary petition was filed. [Bankr. D.I. 27. TRI: p. 72, lines16-19].

All of the foregoing testimony was admissible. Under Fed. R. Evid 701, business owners and officers may testify as to value without being qualified as experts. See, *Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3rd Cir. 1993). The Court ignored all of the foregoing testimony. The Petitioners offered no evidence as to valuation. The only valuation evidence in the record supported a valuation between $40 million and $60 million for the entire Property.

## B. The Undisputed Documentary Evidence Established a Fair Market Value of $1 Million Per Acre

The Debtor also submitted documentary evidence as to the value of the Property.  Petitioners did not object to these exhibits, which were submitted as "Joint" Exhibits.

### 1.    Joint Exhibit 64: Phoenix Gaming and Entertainment Letter of Intent

Phoenix Gaming and Entertainment offered to purchase 25 acres of the gaming Property for $1 million per acre.

### 2.    Joint Exhibit 28: Form 8-K-$6 Million for 10% of the Subsidiary

The Debtor's Form 8-K, filed with the Securities and Exchange Commission, dated April 3, 2023, reported the Entry into a Material Definitive Agreement for the

purchase of 10% of the common stock of Mississippi Gaming Corporation for $6 million. [Joint Exhibit 28].

Mississippi Gaming Corporation, a wholly-owned subsidiary of the Debtor, owns the Diamondhead Property, which is its only asset. A $6 million purchase price for 10% of the stock of the subsidiary, equates to a $60 million valuation for 100% of the stock of the subsidiary, or a $60 million valuation for the entire Property. This comports with the $60 million valuation Colliers' International placed on the Property when putting it on the market for sale.

**3.      Joint Exhibit 10: "Year in Review"**

Joint Exhibit 10 documents the fact that in May 2015, both the Debtor and Petitioners relied on the "CBRE draft Valuation Report" to price their Tranche III Debentures. This confirms Ms. Vitale's testimony that parties used the CBRE draft appraisal to price the debentures.

**4.      Joint Exhibit 25: the Colliers Brochure**

The Colliers Brochure is entitled: "Casino Development Land for Sale." It states at page 3: "Colliers is pleased to present this land for a casino development at $60,000,000." After conducting extensive due diligence, Colliers had just begun to market the Property at $60 million only weeks before the Petition was filed.

The foregoing exhibits are part of the evidentiary record. They were submitted as Joint Exhibits. The Petitioners did not object to any of the foregoing

documentation. The Petitioners did not present any evidence contradicting any of the foregoing valuation evidence.

**5.    Both Parties Relied on the MAI Appraisals, Yet the Bankruptcy Court Completely Ignored Them**

The Debtor attempted to introduce one valuation report and two appraisals performed between 2015 and 2024, but Petitioners objected to their introduction. They were admitted as evidence solely to show that the Debtor and Mississippi Gaming Corporation received and relied on them, but not to prove the value of the Property. However, both sides relied on the appraisals. The appraisals were:

1. August 27, 2015: $39,350,000: CBRE Valuation & Advisory Services [Bankr. Exhibit 1]

2. March 19, 2019: $54,860,000: Newmark Knight Frank Valuation & Advisory LLC [Bankr. Exhibit 2].

3. January 5, 2024: $55,200,000: Newmark Knight Frank Valuation & Advisory LLC [Bankr. Exhibit 3].

These appraisals ranged from $39.5 million in 2015 to $55.2 million in 2024. The testimony showed that the Debtor and Debtor's management relied on the appraisals to structure and price deals, that no interested party had ever questioned the valuations in the appraisals, and that interested parties routinely requested and were provided with copies of the latest appraisal. This testimony was uncontradicted.

The testimony showed that the Petitioners also relied on the appraisals. The testimony showed that the Petitioner, Arneault, who negotiated the debenture deal, selected CBRE to perform the 2015 appraisal. As Ms. Vitale testified, and as Joint Exhibit 10 confirms, both parties relied on the draft CBRE appraisal in 2015 to price the deal's Tranche III Debentures.

The documentary and testimonial evidence also showed that Mr. Arneault and counsel for the Petitioners both requested a copy of the latest appraisal in 2024. Mr. Arneault had a potential purchaser for the property, so Ms. Vitale ordered a new appraisal. (Exhibit 14 and 15). On January 7, 2025, the Debtor forwarded the new, January 5, 2024, appraisal to both Mr. Arneault and counsel for Petitioners. (Exhibit 20). Thus, the evidence showed both parties relied on the 2015 and 2024 appraisals.

Moreover, in its Opinion, in reaching its conclusion that the Petitioning Creditors made a reasonable inquiry into the facts and law, the Bankruptcy Court expressly found that "[t]he record establishes, among other things, that the Petitioning Creditors were aware of … the various appraisals for the Property…" [Opinion, D.I. 42, p. 16]. They were aware of the appraisals because they requested them. The use of appraisals is required and routine in financial and real estate deals of this magnitude. Counsel for Petitioners would have been negligent had he not obtained the appraisals in structuring and pricing the Petitioners' deal. Because both parties relied on the appraisals, the Court should not have ignored them.

25

### 6.    The Bankruptcy Court Acted as Its Own Expert Witness by Substituting Its Judicially-Noticed "Value" for Actual Evidence of Market Value

The Bankruptcy Court did not find that the valuation evidence was not credible. It simply ignored all of the foregoing testimonial and documentary evidence. Instead, the Court substituted its own, clearly erroneous valuation for the uncontroverted testimonial and documentary evidence presented at trial. The Bankruptcy Court erred in disregarding uncontroverted evidence and substituting its own, clearly erroneous, valuation for evidence of valuation submitted at trial.

Moreover, in taking judicial notice of a supposed valuation, the Court acted as an expert witness in the case. The Debtor, of course, had no opportunity to challenge the Court's opinion. The Order for Relief essentially rests on the Court's own opinion as to market value, which is not only incorrect, but which is contrary to the evidence presented.  The Court's valuation was clearly erroneous. Therefore, the trial court's Order for Relief must be vacated.

## IV.    THE BANKRUPTCY COURT ERRED IN FAILING TO DISMISS THE INVOLUNTARY PETITION BECAUSE PETITIONERS HAD ADEQUATE STATE-LAW REMEDIES

The Debtor maintained that the Petition was filed in bad faith because (1) the Petitioners were using the Bankruptcy Court as a collection agency when they had adequate state-law remedies available to them to collect their debt; and (2) the Petition was filed to circumvent the Land Deed of Trust.

26

Bad faith provides an independent basis for dismissing an involuntary petition. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015). Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000). The Petitioners made no attempt to prove good faith. The only evidence in the record reflected the absence of good faith.

## A. The Bankruptcy Court Erred in Finding That the Land Deed of Trust Was Not in Evidence

The Bankruptcy Court clearly erred in finding that "no evidence was presented regarding the Land Deed of Trust." [Opinion, Bankr. D.I. 42, p. 12, footnote 72] The record confirms that the Land Deed of Trust was admitted in evidence by both parties as Joint Exhibit 8 and Joint Exhibit 45.

The Land Deed of Trust expressly provides for "a judicial foreclosure action" in <u>Mississippi</u> in the event of a default. It identifies the procedures to be followed to sell the Property in the event of a default and specifically names the Trustee, a Mississippi attorney, who would handle any sale in the event of a default. (*Id.* at p. 1) The Deed of Trust also includes a provision to change the Trustee. (Id. p. 4, ¶8.) Thus, <u>Mississippi</u>, where the Property was located, was the proper forum for any foreclosure or collection action.

27

**B. The Bankruptcy Court Erred in Finding That Debtor Abandoned Its Arguments Regarding the Land Deed of Trust**

In their post-trial brief, Petitioners claimed that "[t]he Debtor no longer asserts that Petitioning Creditors acted in bad faith because they allegedly violated provisions in the Land Deed of Trust .... and has therefore waived that argument." [D.I. 39, p 21-22]. The Bankruptcy Court adopted Petitioners' contention.

The Court clearly erred in finding that the Debtor abandoned this argument in its post-trial Opening Brief [D.I. 42, p. 12, footnote 72]. The Debtor's brief proves the opposite. The Debtor devoted an entire section in its post-trial Opening Brief to this very issue.[D.I. 38, Section II B, pp.20-21]("The Petition should be dismissed inasmuch as there are state remedies available to Petitioners to collect their debt.")[D.I. 38, p. 20] The Debtor based its argument on the Land Deed of Trust which provides for a "judicial foreclosure action in <u>Mississippi</u> in the event of a default." [D.I. 38, p. 20]. Debtor stated: "The Petitioners have a myriad of state law remedies available to them to collect their debt. They do not need the protections of a Bankruptcy Court." [D.I. 38, p. 21]

The Debtor <u>expressly</u> argued in its post-trial Opening Brief that "[t]he [Chapter 7] filing is being used as a substitute for customary debt-collection procedures and to circumvent the state forum and Mississippi Trustee [who Petitioners] previously agreed to use in the indenture." [D.I. 38, p.21] Thus, the Debtor did not abandon these arguments.

## C. The Existence of Adequate State-Law Remedies Required Dismissal

Adequate state law remedies were readily available for Petitioners to collect their debt, including one in Mississippi, which Petitioners had agreed to use in the event of any default. There was absolutely nothing to suggest the Petitioners' could not collect their Consent Judgment outside of a bankruptcy court. Nor was there a scintilla of evidence presented to suggest that the selected Mississippi Trustee named in the Land Deed of Trust would be unable to effect a fair and orderly distribution of the Debtor's assets. The liens on the Property were all recorded by date and time. They simply had to be paid in the order in which they were recorded. Any excess recovery would simply be divided pro rata amongst the unsecured creditors. Nor did Petitioners present any <u>evidence</u> that the Mississippi Trustee they had previously agreed to use, was incapable of effecting a fair and orderly distribution, and that a bankruptcy was required.

Courts routinely find it improper for creditors to use the bankruptcy courts as a debt-collection device. *In re Forever Green*, 804 F.3d 328, 336-37, referencing, in footnote 7: *In re Nordbrock*, 772 F.2d 397, 400 (8th Cir. 1985)("A creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt."); *In re Tichey Elec. Co., Inc.,* 332 B.R. 364, 374 (Bankr,. N.D. Iowa 2005) ("Bad faith has been found to exist when a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures.")

29

An involuntary Petition must be dismissed where creditors have adequate non-bankruptcy remedies. Otherwise, every judgment creditor would have access to the bankruptcy courts and the bankruptcy courts would be overwhelmed. Here, Petitioners had a security instrument, a designated trustee, a defined foreclosure process, and a Mississippi forum they themselves agreed to use in the event of a default. Contrary to the Bankruptcy Court's finding, the Land Deed of Trust, which governed the matter was, in fact, in evidence. The evidence established that Petitioners had a complete state-law alternative available to collect their debt. Thus, the Bankruptcy Court erred in failing to dismiss the Petition.

## V.    THE BANKRUPTCY COURT ERRED IN FAILING TO DISMISS THE INVOLUNTARY PETITION INASMUCH AS PETITIONERS DID NOT ACT IN GOOD FAITH AND DID NOT COME INTO COURT WITH CLEAN HANDS

### A. The Use of the Bankruptcy Court to Collect a Debt is Not a Valid Bankruptcy Purpose

The use of the Bankruptcy Court here for debt collection purposes was wholly improper. The <u>only</u> Petitioner who testified in this matter was Edson Arneault. Mr. Arneault testified that his motivation for filing the petition was "to get our money back after a ten-year period." [D.I. 27, TRII. P.37; lines 20-24].

The Petitioners argued that the collection of a debt constitutes a permissible use of the Bankruptcy Court. As counsel for Petitioners stated in closing argument: "That's the reason why an involuntary bankruptcy gets filed: people want to get

paid."[D.I. 27, TRII. p. 117, lines 10-11]. "Collection is a valid purpose for an involuntary bankruptcy." [D.I. 27, TRII. p.119, lines17-18].

In addition, Petitioners argued that if they had filed the Involuntary Petition "in the first instance," and "*before* obtaining a Consent Judgment" that "that could be considered a collection effort." (Emphasis added.)[D.I. 27. TRII. p.128, liens12-20] However, the mere fact that Petitioners obtained a Consent Judgment *before* filing the Petition in the Bankruptcy Court conferred no special right on Petitioners to use the Bankruptcy Court as a collection agency. If this were the case, the bankruptcy courts would be overwhelmed with judgment creditors.

The case law on this subject is pellucid. Involuntary bankruptcy proceedings are not to be used as a collection device. "[T]he bankruptcy court is not a collection agency." *In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007). *See, e.g., In re Century Tile Marble, Inc.*, 152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) (creditors' attorney admonished and sanctioned and involuntary petition dismissed for "utilizing the bankruptcy court as a collection agency instead of going to state court where collection claims are properly filed"). The uncontroverted evidence showed that the filing was being used as a substitute for customary debt-collection procedures.

## B. The Bankruptcy Court Ignored Clear Evidence of Bad Faith

The Bankruptcy Court erred in failing to dismiss the Petition for bad faith. The record contains undisputed evidence demonstrating that Petitioners used the threat of involuntary bankruptcy as leverage. Counsel for Petitioners testified at trial that Petitioners would <u>not</u> have filed the Chapter 7 Involuntary Petition had the Debtor agreed, during a conference call on November 21, 2023, to pay $50,000 more in additional attorneys' fees, but Ms. Vitale refused to do so. [Bankr. D.I. 27, TRII. 1-16-25, p. 54] This, after the Debtor had already agreed to pay $175,000 in attorneys' fees only *sixty-two days earlier* to settle *Arneault, et al. v. Diamondhead Casino Corporation* (C.A. No. 1:16-cv-00989-LPS)(D. Del. 2016)[Bankr. Ex. 53, p.4]. The Petitioners were admittedly using the threat of an involuntary bankruptcy to extract even more legal fees from Debtor.

The documentary evidence introduced at trial also showed that Petitioners were never concerned about their security or the dissipation of assets. They were more than willing to forebear, provided they were paid to do so.  On June 2, 2023, counsel for Petitioners threatened the Debtor with bankruptcy so as to cash in on the proceeds of an eminent domain settlement for $1 million obtained by Mississippi Gaming Corporation, a subsidiary of the Debtor. [Bankr. Ex. 48] The Company needed these settlement funds to survive and had borrowed against the anticipated settlement.

Counsel for the Petitioners demanded what amounted to one hundred percent of the eminent domain funds, if a deal then pending ("the O.J. deal"), evidenced in Bankr. Joint Ex. 28, did not close. [Bankr. Ex. 48] This payment would have forced the Company into certain bankruptcy and constituted a preference payment. The Petitioners would readily forebear, provided they got paid ahead of any other creditors, including five debenture holders who shared a first lien with Petitioners, and ahead of their co-lien holder, Appellant herein, with whom they were allegedly in *pari passu*. This pre-petition behavior is the epitome of bad faith which should have resulted in a dismissal of the Petition, but the Bankruptcy Court failed to address it.

**C. Petitioners Filed Their Chapter 7 Involuntary Petition Without Regard for the Effects it Would Have on Other Stakeholders**

Mr. Arneault was the only Petitioner who testified. Mr. Arneault, the former Chairman of the Board of Directors of the Debtor, testified that he did not consider the impact that the filing would have on the publicly traded company. He did not consider the impact that the filing would have on the other creditors. He did not consider the impact the filing would have on the shareholders. He did not consider the impact the filing would have on the company's stock price. [D.I. 27, TRII. p. 38, lines 14-25].

In short, the filing was without any regard whatsoever for the impact it would have on the Debtor and other stakeholders. This total disregard for the impact the

33

filing would have on other creditors, let alone his own former shareholders, creditors and employees, constitutes bad faith. See, *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 428 (Bankr. E.D. Pa. 2013), citing *In re Canon Express Corp.*, 280 B.R. 450, 455-56 (Bankr.W.D. Ark. 2002)(finding that petitioning creditor's statement that he filed "to get my money" without regard to other creditors' priorities was evidence of bad faith.) *See, also, In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336-37(3d Cir. 2015) ("He put his own interests above all others.")("He was also using the bankruptcy process to exert pressure on Forever Green to pay the consent judgment without regard to Forever Green's other creditors, many of whom had higher priority claims.")

The Petition should have been dismissed as having been filed in bad faith inasmuch as Petitioners admitted it had been filed to collect a debt, an improper bankruptcy purpose, that it would <u>not</u> have been filed if Debtor agreed to pay more attorneys' fees, and that it was filed in total disregard for the impact it would have on other creditors and stakeholders.

## D. Petitioners Did Not Come Into Court With Clean Hands and Did Not Proceed in Good Faith

The Petition filed in the Bankruptcy Court was based on a judgment obtained in *Arneault, et al, v. Diamondhead Casino Corporation,* C.A. No. 1:16-cv-00989-LPS (D. Del. 2016)("the Collection Case"), by fabricating subject-matter

jurisdiction in the federal court, by deliberately excluding the real party in interest whose inclusion would have destroyed diversity of citizenship. The Petitioners did not come into the Bankruptcy Court with clean hands. This, in and of itself, constituted bad faith, which should have resulted in a dismissal of the case.

The Bankruptcy Court had an affirmative duty to review the subject-matter jurisdictional issue on the merits when the matter was brought to its attention. It did not do so. This was reversible error.

The Petitioners filed their Petition in the Bankruptcy Court in which they falsely claimed that the largest Petitioner was the holder of the two largest debentures held by Petitioners, for approximately one-third of the total amount claimed by all eight Petitioners, when Petitioners' own exhibits showed that the two largest debentures were still held by the same limited liability company deliberately excluded as a plaintiff in the Collection Case. [Bankr. D.I. 12, Exhibit B]

The Petitioners falsely claimed that copies of each of the Petitioners' debentures were attached as exhibits to a sworn Declaration submitted in opposition to the Debtor's motion to dismiss the Petition, when no debentures were attached for the largest Petitioner, since no such debentures ever existed. [Declaration of the Petitioner Arneault, Bankr. D.I. 12, ¶6 and Exhibit B].

The Petitioners falsely claimed that each Petitioner held a judgment against the Debtor when the largest Petitioner, J. Steven Emerson as Successor to Steven

35

Emerson Roth IRA, was not even named as a Plaintiff in *Arneault, et al, v. Diamondhead Casino Corporation,* C.A. No. 1:16-cv-00989-LPS (D. Del. 2016) ("the Collection Case")[D.I. 1]. The Petitioner Arneault's own Exhibit F, a copy of the Consent Judgment, attached to his sworn Declaration, confirmed this. [Bankr. D.I. 12-6, p.2].

The Petitioners did not have clean hands when they entered the Bankruptcy Court. They did not act in good faith while in the Bankruptcy Court. A bankruptcy court is a court of equity.  The Court erred in failing to dismiss the Petition once these matters were brought to its attention.

## VI. THE COURT ERRED IN GRANTING CHAPTER 7 RELIEF BECAUSE LIQUIDATION WAS NOT IN THE BEST INTERESTS OF CREDITORS OR THE ESTATE

The Bankruptcy Court clearly erred in concluding that a Chapter 7 liquidation served the best interest of the creditors. The record demonstrates the opposite. Liquidation introduced substantial regulatory and economic risk, threatened the Debtor's most valuable entitlement, and ensured a depressed sale price that would harm every stakeholder except the Petitioners and Appellant, who shared a first lien on the Property. Nothing in the record supported the conclusion that a Chapter 7 trustee could preserve or enhance value more effectively than the Debtor, which had already retained Colliers International to market and monetize the Property.

### A. A Chapter 7 Was Not in the Best Interest of Creditors Because It Exposed the Estate to Severe Risk of Loss of Value in the Debtor's Primary Asset

The Debtor's principal asset was its Diamondhead, Mississippi Property which derived its value almost entirely from its Mississippi Gaming Site Approval. Mississippi Gaming Site Approval is not transferable and is revocable under the regulations of the Mississippi Gaming Commission. (Miss. Gaming Regulation 1.4.)[2] Mississippi Gaming Site Approval is not tantamount to an easement that runs with the land. Instead, it is controlled by and subject to the Mississippi Gaming Control Act and the rules and regulations of the Mississippi Gaming Commission. All legal proceedings related to the approval must be adjudicated in the courts of Mississippi. (See Ex. 9, p.9) The Gaming Commission retains full authority to revoke this entitlement.

A Chapter 7 liquidation materially increased the risk of revocation of Gaming Site Approval. A distressed liquidation, the appointment of a trustee unfamiliar with the regulatory landscape in Mississippi, and the uncertainty surrounding the Debtor's future, all created instability that could trigger regulatory scrutiny or revocation. Without Gaming Site Approval, the Property's value would plummet. A proceeding that jeopardizes the estate's only meaningful asset cannot, as a matter of

---

[2] A Court may take judicial notice of state regulations. *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742, n.4 (1976)(taking judicial notice of state regulations).

law or fact, be in the best interest of creditors. In this case, a Chapter 7 liquidation introduced a substantial risk that the approval could be lost and, therefore, was not in the best interest of the creditors or the estate.

## B. A Chapter 7 Would Not Maximize the Value of the Estate

To invoke the bankruptcy process, Petitioning creditors must demonstrate a legitimate bankruptcy purpose, namely, that bankruptcy will maximize recovery for the Debtor's creditors. Petitioners offered no such showing.

In the context of a Chapter 7 proceeding, the purpose must be to marshal a debtor's assets in order to achieve a <u>greater</u> pro rata distribution among a debtor's various <u>unsecured</u> creditors then what would otherwise be available outside of bankruptcy. A petitioner must have some plausible reason to believe that the bankruptcy system is necessary to <u>maximize</u> the recovery for a debtor's creditors. *In re Forever Green Fields, Inc.*, 500 B.R. 413, 425 (Bankr. E.D. Pa. 2013). In a court of equity, a petitioning creditor must come to the court for a proper purpose.

A Chapter 7 liquidation here would not increase the pro rata recovery of unsecured creditors. It would do just the opposite. A forced sale under the stigma of a Chapter 7 distress auction would benefit only the Petitioners and principals of the Company, including Appellant, who shared a first lien with Petitioners. Unsecured creditors, former employees, and stockholders would be irreparably harmed. The record contains no evidence that a trustee-conducted liquidation would yield a higher

38

return than the Debtor's and Colliers' ongoing efforts. A Chapter 7 would not maximize recovery for the Debtor's <u>unsecured</u> creditors.

On the contrary, the only way to maximize recovery for the creditors was to avoid a fire sale liquidation of the subsidiary's asset. The best interests of both the creditors and the Debtor were in the continued existence of the Company and allowing Colliers International to do what it was already doing. A Chapter 7 liquidation would only end in the sale of the subsidiary's property at a severely depressed price, thereby minimizing, rather than maximizing value. Thus, the Court could not have found that a Chapter 7 would maximize recovery for the Debtor's creditors.

**C. A Chapter 7 Served No Useful Purpose and Would Only Increase Costs**

The Debtor had already retained Colliers International, which had completed extensive due diligence, produced two marketing brochures, was actively marketing the Property, and was engaged in discussions with interested parties when the Petition was filed. A Chapter 7 Trustee could not improve upon that process. A Chapter 7 would simply add enormous, and wholly unnecessary costs, fees and legal expenses to a process that had already just gotten underway. Nothing in the record suggested that a Trustee could do more than Colliers International and the Debtor were already doing.

Indeed, after being appointed, the Trustee simply re-retained Colliers to do what it was doing prior to the filing of the Petition, confirming that the Trustee added no incremental value. Now, the Estate is burdened with substantial administrative costs, fees for the Trustee, fees for legal counsel to the Trustee, fees for the Trustee's accounting firm, break-up fees, and the costs and expenses of administering a Chapter 7 estate. These costs and fees are substantial and directly <u>reduce</u> creditor recoveries. In addition, the taint of a Chapter 7 distress auction would serve no purpose other than to negatively affect the market's perception of the Property and depress the value of the Debtor's primary asset, which only further harms the estate.

The record demonstrates that there was nothing a Trustee could do that was not already being done for the estate, at absolutely no cost to the estate. Nothing in the record supports the conclusion that a Chapter 7 would enhance value. Everything in the record shows that it would destroy or significantly reduce value. The Bankruptcy Court's finding that liquidation was in the best interest of creditors was therefore clearly erroneous.

## VII.  THE BANKRUPTCY COURT CLEARY ERRED IN FINDING THERE WAS A DISSIPATION OF ASSETS

The Bankruptcy Court's finding that there was a dissipation of assets was clearly erroneous as a matter of fact and of law. The record is devoid of any evidence of dissipation of assets. Dissipation requires evidence of <u>improper</u> depletion of estate

assets or preferential treatment of creditors.[3] Ordinary business expenses, routine accounting adjustments, and payments made by a non-debtor subsidiary cannot constitute a dissipation of assets as a matter of law.

## A. Petitioners Presented No Evidence of Dissipation of Assets

The Petitioners presented no evidence of any dissipation of assets. Petitioners' contention that there was a dissipation of assets rested on the argument of counsel, who claimed that a Chapter 7 Trustee was required because the Debtor might be leasing too much office space. "I think the trustee would make a business judgment that there's no reason why a nonoperating entity needs to lease that much space."[D.I. 36, TRII-p. 118, lines 21-23]. The argument of counsel is not evidence and the Petitioners presented no testimony or evidence on this subject.

On the contrary, the critical need for this office space was described, in part, in Exhibit 33, at page 3.[4] Interestingly, the sole Petitioner who testified, Mr. Arneault, was not asked a single question about the office, the office rent, or Ms. Vitale's salary. This is understandable, inasmuch as the Company's SEC filings confirm that the Company is accruing the same salary and is paying and/or accruing the same rent for the same office it had when Mr. Arneault was Chairman of the Board. If the rent were unreasonable, unnecessary, or too high, Mr. Arneault, as

---

[3] The Court found no evidence of preferential treatment. [Opinion, D.I. 42, p. 17].
[4] As its SEC Form 10-K filings will confirm, the Company has no off-site storage.

President of the Lessee, had an affirmative duty to reduce it, or move the Company to a smaller office. In any case, as a matter of law, it is well-established that the payment of rent and salary is not a dissipation of assets.

## A. The Bankruptcy Court Took Improper Judicial Notice of SEC Filings and Then Misinterpreted Them

The Bankruptcy Court took judicial notice of entries in <u>three</u> of the Company's SEC filings to conclude that there was a dissipation of assets. It stated: "[w]ith respect to the dissipation of assets, Diamondhead's SEC filings show the assets of the Company are steadily decreasing as liabilities increase." [Opinion, D.I. 42, p.18] Even, assuming, *arguendo*, the assets of the Company were steadily decreasing as liabilities increased, that would not constitute a dissipation of assets, as a matter of law. There is simply nothing improper about incurring ordinary business expenses. To constitute a "dissipation of assets" there must be evidence of improper depletion, concealment of assets, or improper transfers of assets. Ordinary financial behavior cannot be treated as misconduct justifying a bankruptcy filing.

Federal Rule of Evidence 201 entitles a party "to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." The Bankruptcy Court violated Rule 201 by taking judicial notice of these entries and doing so, for the first time, in its written Opinion, rendered long after the record had closed. This deprived the Debtor of any opportunity to challenge the propriety of taking judicial notice, the

42

nature of the fact to be noticed, or the meaning of the entries to be judicially noticed. This violation resulted in the Court's incorrect finding of fact and conclusion of law.

The Bankruptcy Court clearly misinterpreted the entries in these filings which reflected ordinary business expenses, routine accounting adjustments, and historical cost reporting, not a "dissipation of assets." Moreover, had the Bankruptcy Court reviewed the last Form 10-Q filed by the Debtor for the period ending March 31, 2025, before the Court issued its Opinion on July 30, 2025, it would have found *liabilities* substantially decreasing, not increasing. The last Form 10-Q the Court consulted, for the period ending September 30, 2024, showed liabilities of $19,855,180. [Opinion, D.I. 42, p. 18] The Form-10 Q for the period ending March 31, 2025, shows liabilities of $18,379,042. Thus, the liabilities decreased by $1,476,138 from the last Form 10-Q the Court relied upon. The Bankruptcy Court's *selective* use of SEC filings to take judicial notice underscores the danger of taking judicial notice without notice to the parties and affording the parties an opportunity to be heard.

Again, the publicly traded Debtor reported total assets based on GAAP. These included the Property, at cost, not market value. The Debtor's **assets** did not decline in value. They went up. The Property was appraised on January 5, 2024, at $55,200,000. The appraised value of the Property went up from its last appraisal dated March 19, 2019. Thus, the Court's conclusion was factually false. Had the

Court notified the Debtor of its intent to take judicial notice of the foregoing entries, this clear error would have been avoided.

## B. Ordinary Business Expenses Are Not Dissipation as a Matter of Law

In finding that liabilities were increasing, the Court treated the payment or accrual of salary, rent, interest, and expenses as "dissipation." This was incorrect as a matter of law. Even in distressed companies, the payment or accrual of ordinary business expenses, including salary, rent, interest, and expenses, is not, as a matter of law, a dissipation of assets. There was nothing improper about these expenses. No evidence was presented even suggesting there was anything improper about any of these expenses.

The Debtor's SEC filings confirmed that the Debtor continued to pay or accrue the same salary and the same rent paid when the Petitioner, Mr. Arneault, was Chairman of the Board of Directors of the Debtor. Moreover, the Debtor's reported assets declined by a mere $206,260, over a full nine-month period, a mere $23,000 per month. This is extraordinarily low for a fully-reporting, publicly traded company, that pays outside auditors and outside accountants to prepare its financial statements and periodic reports.

Judicial notice cannot be used to establish contested facts, nor can it be used to interpret financial statements or draw inferences about business operations. The Bankruptcy Court did exactly what Rule 201 forbids. It used judicial notice to infer

44

wrongdoing from <u>ordinary</u> business entries, without notice to the Debtor, and without any evidentiary support. This makes the legal error unmistakable.

## C. The Subsidiary's Payments Do Not Constitute Dissipation as a Matter of Law

The Bankruptcy Court could not tell from the record if there was a dissipation of assets of the **Debtor,** based on the ***subsidiary's*** payment of $20,000 to each of two unrelated third-parties, who loaned money to the ***subsidiary,*** upon express condition that they be immediately repaid from the proceeds of a potential eminent domain settlement.  These payments were audited and fully disclosed in the Debtor's SEC filings. This was a legitimate loan from an unrelated third party to the subsidiary. As a matter of law, the repayment of the loan could <u>not</u> constitute a dissipation of assets of the Debtor.

The Debtor had no operations, no revenue stream and no money.  Every dollar available for payment came from the proceeds of the eminent domain settlement paid to Mississippi Gaming Corporation, the subsidiary. The Petitioners knew this before filing their Petition because the Appellant expressly informed counsel for Petitioners, in an email, dated November 16, 2023, that all of the proceeds of the eminent domain settlement were paid to the <u>subsidiary</u>, not to the Debtor. [Bankr. Joint Exhibit 59] This fact was also disclosed in the Form 10-Q. [Bankr. Exhibit 59] Therefore, it would be legally impossible for the repayment to the two lenders to constitute a dissipation of assets of the Debtor. The payments were entirely

45

proper and required pursuant to the express terms of the loan agreement with the subsidiary.

## VIII. THE BANKRUTPCY COURT ERRED IN DENYING CONVERSION TO CHAPTER 11

Section 706(a) of the Bankruptcy Code provides that "[t]he Debtor may convert a case under this chapter to a case under chapter 11 … at any time," if the case has not previously been converted." 11 U.S.C. §706(a).  The Supreme Court has held that this right may be denied only in the narrow circumstances where the debtor has engaged in bad faith conduct. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 372-74 (2007)(conversion may be denied only upon a showing of bad faith or abuse of process).  Here, the Bankruptcy Court made no finding of bad faith on the part of the Debtor.  The only evidence of bad faith in the case related to the conduct of the Petitioners.

The Debtor had an unqualified statutory right to convert the case to Chapter 11 because (1) the case had not previously been converted; (2) the Debtor was eligible to be a debtor under Chapter 11; and (3) the Bankruptcy Court made no finding of bad faith on the part of the Debtor. Under controlling Supreme Court and Third Circuit precedent, the absence of a bad-faith finding is dispositive. Therefore, the denial of conversion must be reversed.

**A. Section §706(d) Requires Only That the Debtor be Eligible Under §109(d)**

Section 706(d) provides that a debtor may convert a Chapter 7 case to Chapter 11 "only if the debtor may be a debtor under such chapter." Section 109(d) sets out who "may be a debtor" under Chapter 11. Section 109(d) requires only that the debtor (1) be a "person" eligible under §109(b), and (2) not fall within one of the excluded categories (i.e., railroads). Diamondhead Casino Corporation is a Delaware corporation, domiciled in the United States, and is not excluded under the categories identified under §109(b). Thus, the Debtor indisputably met §109(d)'s requirements and clearly qualified to be a debtor under Chapter 11.

Nevertheless, the Bankruptcy Court denied Debtor's motion to convert the case to Chapter 11. The Court concluded that Diamondhead "could not have qualified" as a Chapter 11 debtor because it lacked operations, faced continuing losses, and had no likelihood of rehabilitation. [Bankr. D.I. 42, Opinion, pp.25-28]. However, these are §1112(b) standards for dismissal of an existing Chapter 11 case. These are not standards for determining whether a Chapter 7 debtor may exercise its one-time right to convert to Chapter 11 under §706(d). The Bankruptcy Court's reliance on these factors was legal error and contrary to the plain language of the statute.

There is nothing in §706(d) that authorizes a bankruptcy court to deny conversion to Chapter 11 based on a lack operations, continuing losses, likelihood

of rehabilitation, or any other discretionary considerations listed in §1112(b). Congress placed the considerations in §1112(b) for use *after* a case was in Chapter 11, not as a gatekeeping device to prevent a debtor from entering Chapter 11 in the first place. Courts cannot deny conversion based on a hypothetical §1112(b) dismissal. Doing so would collapse §706(a) into §1112(b) and would eliminate the statutory right to convert.

The Bankruptcy Court emphasized the Debtor's inability to rehabilitate. But rehabilitation is not a prerequisite to Chapter 11 eligibility. On the contrary, §1112(b)(4) expressly authorizes a Chapter 11 plan to "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." Congress thus made it clear that Chapter 11 encompasses liquidating plans which do not require ongoing operations, future profitability, or rehabilitation. The Bankruptcy Court's contrary conclusion has the effect of erasing §1112(b)(4) from the statute.

The Court denied conversion based on its own assessment that there would be continuing losses and no reasonable likelihood of rehabilitation. These considerations are legally irrelevant under §706(d). They appear nowhere in §109(d), and they cannot be imported into the statute through judicial discretion.

While legally irrelevant here, the Bankruptcy Court's denial of conversion was obviously influenced by its erroneous belief that the Debtor's assets were worth

48

a mere $4.79 million based on its improper use of judicial notice and its own misreading of the Debtor's Form 10-Q. Because the Court's valuation was clearly erroneous, its conclusion that a Chapter 11 would be futile, was likewise erroneous. In any case, the Debtor was clearly entitled to convert the case to Chapter 11 and the Bankruptcy Court erred in concluding otherwise.

## B. Conversion Was Necessary to Resolve Two Pending Eminent Domain Easements

Even apart from the statutory right to convert, conversion was warranted to allow the Debtor to resolve unsettled issues with respect to the two permanent eminent domain easements. Even in the bankruptcy context, deferral to the appropriate forum is well-recognized where a critical issue lies within the purview of a specialized agency. Here, a critical issue was pending within the purview of a specialized court, namely, the Special Court of Eminent Domain, in Hancock County, Mississippi. These eminent domain issues fell squarely withing the jurisdiction of a specialized state tribunal.

This specialized matter, which was already in progress, could most efficiently and less expensively be resolved by current management, which was already intimately familiar with the matter. Here, the Debtor's President and CEO, an attorney, was already handling the matter, had already negotiated a $1 million settlement, and could resolve the remaining easement issues at no cost to the estate. Otherwise, a Trustee would have to retain outside counsel, at significant expense to

49

the estate, to do what the Debtor's President was already doing. Once the final paperwork was finished, Mississippi Gaming Corporation, was entitled to receive approximately $150,000, the remaining proceeds of the settlement. Conversion therefore served the best interests of the estate, creditors and all stakeholders.

## C. Conversion Was Necessary to Allow Colliers International to Complete the Monetization Process Already Underway

In December 2023, the debtor retained Colliers International to sell part or all of the Diamondhead Property or to otherwise monetize the Property. Colliers spent the next four months conducting extensive due diligence and, at no cost to the Debtor, producing two brochures, one for a sale of part or all of the Property at $60 million [Bankr. Exhibit 25], and one for an equity investment in the Property. [Bankr. Exhibit 24] Colliers began actively marketing the Property in April/May of 2024 and was engaged with multiple interested parties, including a casino. The Petitioners knew this. [Bankr. Exhibit 23]. Nevertheless, the Petitioners filed their Petition on June 12, 2024.

The Debtor should have been allowed to convert to a Chapter 11 so as to allow Colliers International to do what it had been hired to do, namely, to monetize the Property or sell part or all of the Property to get the Petitioners paid. The Debtor had already hired Colliers International to do what a Chapter 7 Trustee would do, but without the additional administrative and legal fees and expenses the appointment of a Trustee would require. Indeed, after being appointed, the Trustee simply

50

retained Colliers International again to do what Colliers was already doing before the Petition was filed. The Trustee-related costs of doing the same thing that was already being done, have only burdened the estate with millions of dollars of wholly unnecessary costs, fees and expenses.

## D. The Debtor Had Already Arranged for Debtor-in-Possession Financing

Ms. Vitale testified that she had already looked into and secured a source of debtor-in-possession financing. She testified that "it's very expensive, but it takes out the debt and they'll do it." [Bankr. D.I. 27, TR.I, p. 147] The debtor-in-possession financing would have paid off the Petitioners, stabilized operations and allowed Colliers to complete the sale process. The Bankruptcy Court ignored this uncontroverted evidence in denying Debtor the right to convert.

## E. Because the Case Had Not Previously Been Converted and Debtor Met the Qualifications for Conversion, Denial of Conversion Was Error

The case had not previously been converted. The Debtor sought conversion to preserve its asset, resolve pending state-court easement issues, continue the monetization process, and pay the Petitioners in full. The evidence demonstrated that a Chapter 11, rather than a Chapter 7 liquidation, would preserve and maximize value.

Section 706(a) is unequivocal. The Debtor had a right to convert here. The Bankruptcy Court's refusal to convert the case was contrary to the plain text of the

statute and controlling authority. Inasmuch as the Court applied the wrong legal standard and made no finding of bad faith, the denial must be reversed.

## CONCLUSION

For the reasons set forth above, the Order for Relief cannot stand. The Bankruptcy Court proceeded without subject-matter jurisdiction, relied on a judgment that is void *ab initio*, and entered findings of fact that are clearly erroneous and unsupported by the record. Its insolvency analysis rested on an improper use of judicial notice, a misreading of SEC filings, and a legally impermissible substitution of cost for fair market value. Its dissipation of assets finding rested on an improper use of judicial notice and an incorrect interpretation of entries in SEC filings.

The Bankruptcy Court's failure to dismiss the Petition, since adequate state-law remedies were available for Petitioners to collect their judgment, rested on its incorrect finding that the Land Deed of Trust was not in evidence and its incorrect finding that Debtor had abandoned arguments relating to the Land Deed of Trust. It's finding that a Chapter 7 would somehow maximize recovery for the creditors, given the substantial costs of a Chapter 7 and the taint of a Chapter 7 distress auction, was incorrect. It's finding that the Debtor was not qualified to convert to Chapter 11 was based on an incorrect interpretation of the applicable legal standard for conversion. Finally, the Court ignored clear evidence of Petitioners' pre-petition and post-petition bad faith.

For the foregoing reasons, the Appellant respectfully requests that this Court:

(i)     Vacate the Bankruptcy Court's Order for Relief; and

(ii)    Remand with instructions to dismiss the Involuntary Petition;

(iii)   In the alternative, grant Debtor's motion to convert the case to Chapter

        11; and

(iv)    Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Deborah A. Vitale
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
Email: vitaledav@aol.com
*Appellant, Pro Se*

Dated:   January 22, 2026