No. 25-01022-MN
No. 25-01167-MN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:   DIAMONDHEAD CASINO CORPORATION,

DEBTOR.

DEBORAH A. VITALE,

APPELLANT,

v.

EDSON ARNEAULT, ET AL.,

APPELLEES.

## ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

Bankruptcy Case No. 24-11354 (JKS)(Chapter 7)

## APPELLANT'S REPLY BRIEF

Deborah A. Vitale
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
Email: vitaledav@aol.com

*Appellant Pro Se*

Dated: March 20, 2026

i

## TABLE OF CONTENTS

TABLE OF CITATIONS AND AUTHORITIES ............................ iv

ARGUMENT ...................................................................... 1

I.    THE PENDING RULE 60 MOTION RAISES A
      THRESHOLD JURISDICTIONAL ISSUE ........................ 1

II.   THE BANKRUPTCY COURT LACKED SUBJECT
      MATTER JURISDICTION TO ENTER AN ORDER FOR
      RELIEF .......................................................... 2

III.  APPELLANT HAS APPELLATE STANDING UNDER
      THE THIRD CIRCUIT'S "PERSON AGGRIEVED"
      DOCTRINE ...................................................... 4

IV.   THE BANKRUPTCY COURT'S LAND VALUATION
      FINDING WAS CLEARLY ERRONEOUS ...................... 7

V.    THE UNDISPUTED EVIDENCE DEMONSTRATES
      BAD FAITH UNDER FOREVER GREEN...................... 14

VI.   THE RECORD DOES NOT SUPPORT THE BANKRUPTCY
      COURT'S FINDING OF DISSIPATION OF ASSETS .......... 19

VII.  THE COURT ERRED IN DENYING THE DEBTOR'S
      ONE-TIME STATUTORY RIGHT TO CONVERT UNDER
      §706(a) ......................................................... 23

CONCLUSION ................................................................ 28

CERTIFICATE OF COMPLIANCE .......................................... 30

CERTIFICATE OF SERVICE ................................................ 31

# TABLE OF CITATIONS AND AUTHORITIES

**Cases**                                                                    **Page**

*Arneault v. Diamondhead Casino Corporation,*
   C.A. No. 16-cv-00989-MN (D. Del. 2016) …………………......1, 2, 15, 18

*Hill, et al. v. Cohen, et al.,*
   (No. 22-2023 )(3d Cir. 2022) …………………………………… 21, 22

*In re Dykes,*
   10 F.3d 184 (3d Cir. 1993) ………………………………………….. 5, 6

*In re Forever Green Athletic Fields, Inc.,*
   804 F.3d 328 (3d Cir. 2015) ……………………………….…….. Passim

*In re NLG, LLC,*
   2023 WL 2053920 (Bankr. D. Del. Feb. 13, 2023) ………..……... 23

*In re QDN LLC,*
   363 F. App'x 873 (3d Cir. 2010) ……………………………..… 1, 6

*In re Tower, Inc.,*
   416 F.3d 229, 23 (3d Cir. 2005) ………………………………..... 22

*Marrama v. Citizens Bank of Massachusetts,*
   549 U.S. 365, 372-74 (2007) …………………………..……….. 24

*Tyler v. O'Neill,*
   1998 WL 695991, at *3 (E.D. Pa. Oct.6, 1998),
   *aff"d,* 189 F.3d 465 (3d Cir. 1999) ………………………….. 22

## Statutes

28 U.S.C. §158(a) ................................................................. 5, 6, 7
11 U.S.C. §105(a) ................................................................. 25
11 U.S.C. §109(d) ................................................................. 25-29
11 U.S.C. §109(e) ................................................................. 25, 26
11 U.S.C. §303(b) ................................................................. 2
11 U.S.C. §303(d) ................................................................. 5, 6, 7
11 U.S.C. §303(h) ................................................................. 11, 12
11 U.S.C. §706(a) ................................................................. 24-26, 28
11 U.S.C. §706(d) ................................................................. 27
11 U.S.C. §1112(b) ................................................................. 25

## Rules

Fed. R. Evid. 201(c) ................................................................. 12, 14
Fed. R. Evid. 201(e) ................................................................. 8, 13, 23
Fed. R. Evid. 701 ................................................................. 13

Fed. R. Civ. P. 60(b)(4) ................................................................. 1
Fed. R. Civ. P. (60)(d)(3) ................................................................. 1

## ARGUMENT

### I. THE PENDING RULE 60 MOTION RAISES A THRESHOLD JURISDICTIONAL ISSUE

The threshold issue in this appeal is the validity of the 2023 Judgment entered in *Arneault v. Diamondhead Casino Corporation*, C.A. No. 16-cv-00989-MN (D. Del. 2016) ("the Collection Case"). That judgment is the sole basis on which all eight Petitioning Creditors claimed eligibility under 11 U.S.C. §303(b). If that Judgment is void for lack of subject-matter jurisdiction, the Bankruptcy Court lacked jurisdiction to enter the Order for Relief. This appeal can be decided on that issue alone.

Appellant filed a Motion to Reopen, Vacate Judgment, and Dismiss the above-referenced case pursuant to Federal Rule of Civil Procedure 60(b)(4) and 60(d)(3), asserting that the Judgment is void *ab initio* for lack of subject-matter jurisdiction and for fraud on the Court. The motion is fully briefed and pending before this Court. As the Third Circuit has made clear, a federal court must address subject-matter jurisdiction whenever it arises. *In re QDN LLC*, 363 F. App'x 873, 875 (3d Cir. 2010).

Appellees correctly acknowledge that this subject-matter jurisdiction issue arising from the Collection Case was **not** before the Bankruptcy Court. Appellees' position is that the Judgment "remains valid" unless and until declared void. Their

position underscores the need for this Court to decide the Rule 60 motion first. If the judgment is void, there is no need to reach the remaining issues raised in this appeal.

## II. THE BANKRUPTCY COURT LACKED SUBJECT-MATTER JURISDICTION TO ENTER AN ORDER FOR RELIEF

### A. A Void Judgment Cannot Support Subject-Matter Jurisdiction

The Petitioning Creditors' eligibility under 11 U.S.C. §303(b) rests on the Judgment entered in *Arneault v. Diamondhead Casino Corporation*, C.A. No. 16-cv-00989-MN (D. Del. 2016) ("the Collection Case"). All eight Petitioners relied on the same Judgment. If that Judgment is void, then the Bankruptcy Court lacked subject-matter jurisdiction and had no authority to enter an Order for Relief.

A void judgment is a legal nullity. It cannot serve as the statutory foundation for Petitioners' involuntary petition under 11 U.S.C. §303(b). It cannot create jurisdiction in a court that had no subject-matter jurisdiction. Because §303(b) eligibility is a statutory prerequisite to subject-matter jurisdiction, a void judgment cannot satisfy it as a matter of law.

### B. Appellees Do Not Rebut Evidence of Fabricated Diversity Jurisdiction

Appellees make no attempt to rebut the undisputed evidence of fabricated jurisdiction in the Collection Case. They do not deny: (1) that to defend a motion to dismiss for lack of jurisdiction, the Plaintiffs represented to the District Court that there had been an Assignment of debentures from Millenium Trust Company, LLC

2

*prior* to the filing of that case; and (2) that Plaintiffs represented that a copy of the Assignment was annexed as an exhibit to a Declaration filed with the District Court when no Assignment was annexed, since no such Assignment existed. Appellees do not deny that the District Court accepted their representation that there had been an Assignment of the debentures prior to the filing of the case and moved forward with the case.

As to the Bankruptcy Case, Appellees do not deny: (1) that on September 4, 2025, Petitioners' counsel admitted, on the record, that there was no Assignment; (2) that the documentary evidence introduced by Petitioners shows that the two largest debentures were issued to Millenium Trust Company, LLC; and (3) that there is no Assignment to show that the Millenium Trust Company, LLC debentures were assigned to anyone else.

The Appellees' had repeated opportunities to produce an Assignment of the Millenium Trust Company, LLC debentures and lay this whole matter to rest in two courts and on appeal. They never did so because, as counsel finally admitted on September 4, 2025, no Assignment exists. Thus, the representations made to the District Court to obtain jurisdiction were false. Likewise, the representations made in the Bankruptcy Case, as to ownership of the two largest debentures, were false. The Appellees make no attempt to explain how an Assignment that never existed

could possibly be annexed to a Declaration filed in the federal court. Their defense is that it is the Debtor's fault for failing to catch both frauds on the two courts sooner.

Petitioners' refusal to address the underlying facts, which can be confirmed by simply taking judicial notice of their own pleadings filed in this Court, is a tacit concession that the Judgment rests on fabricated subject-matter jurisdiction and is therefore void.

## C. Subject-Matter Jurisdiction Must Exist at the Time of Filing

Appellees contention that the Debtor "conceded" jurisdiction or that Appellant "waived" jurisdiction reflects a fundamental misunderstanding of federal jurisdiction. Subject-matter jurisdiction cannot be conferred on a court by agreement of the parties. It cannot be waived, forfeited, conceded, created by silence or a failure to respond, created by a trustee's litigation choices, or cured by editing proposed closing documents six years *after* a case was filed.

A court either has jurisdiction at the time a case is filed or it does not. Appellees cite no authority to the contrary. Nor could they. The Supreme Court and the Third Circuit have repeatedly held that subject-matter jurisdiction is immutable and non-waivable. A subject-matter defect is fatal to a case.

4

## III. APPELLANT HAS APPELLATE STANDING UNDER THE THIRD CIRCUIT'S "PERSON AGGRIEVED" DOCTRINE

### A. The Appointment of a Trustee Does Not Affect Appellant's Right to Appeal

Appellees claim that once a Chapter 7 trustee is appointed, only the trustee has standing to appeal. That rule applies only to estate causes of action, not to orders that directly impair the rights of "aggrieved persons." Appellant is not asserting a claim belonging to the estate. She is appealing a final Order for Relief under 28 U.S.C. §158 that directly and personally harms her. The appointment of a trustee does not erase her statutory right to seek review under this statute.

### B. Section 303(d) Does Not Govern Appellate Standing

Appellees' standing argument rests on a fundamental legal error. Appellees conflate standing to contest an involuntary petition in the bankruptcy court under 11 U.S.C. §303(d) with standing to appeal an Order for Relief under 28 U.S.C. §158. These are separate statutory schemes governed by different standards. Section 303(d) governs who may litigate in the bankruptcy court; §158 governs who may seek appellate review. These statutes operate independently. The Third Circuit has long held that appellate standing is governed exclusively by the "person aggrieved" doctrine. *In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993).

Nothing in §303(d) restricts who may appeal an Order for Relief. Appellees cite no authority holding §303(d) overrides the "person aggrieved" doctrine since

5

none exists. Their contention ignores the distinction between trial-level participation and appellate review and is clearly contrary to Third Circuit law.

## C. Appellant Satisfies the "Person Aggrieved" Standard

As the Third Circuit explained, a person is "aggrieved" and has standing to appeal if the order "diminishes their property, increases their burdens, or impairs their rights." *Dykes*, 10 F.3d at 187. Appellant easily satisfies this standard.

Appellees do not deny that the Order for Relief removed Appellant from control of the Debtor, extinguished her authority to act as an officer and director, impaired her rights as the Debtor's largest creditor, jeopardized her secured and unsecured claims, eliminated her compensation as the Debtor's sole employee, and destroyed the value of her equity and ESOP interests. These are direct, concrete, adverse pecuniary effects. If a person suffering this magnitude of harm is not "a person aggrieved," the doctrine would have no meaning.

## D. *QDN* Does Not Restrict Appellate Standing Under §158

Appellees' reliance on *In re QDN LLC*, 363 F. App'x 873 (3d Cir. 2010) is misplaced. *QDN* holds only that creditors cannot contest an involuntary petition in the bankruptcy court. It does not address appellate standing, §158, or who may appeal an Order for Relief. It does not hold that §303(d) overrides the "person aggrieved" doctrine. Appellees' reading stretches QDN far beyond its narrow

6

holding and ignores the Third Circuit's consistent application of the "person aggrieved" doctrine.

## E. Appellees' Interpretation Conflicts With Established Appellate Practice

Appellees' interpretation cannot be reconciled with the long history of appeals brought by non-trustees that federal courts have routinely adjudicated on the merits. These include appeals brought by shareholders, officers, creditors, guarantors, and other stakeholders whose rights were directly affected by a final order of a Bankruptcy Court. Thus, it is obvious that §303(d) does not govern who may seek appellate review under §158.

Appellees' interpretation would completely nullify the "person aggrieved" doctrine. That doctrine exists precisely because bankruptcy orders often affect individuals whose rights are distinct from those of the estate. Under Appellees' theory, the very individuals most directly harmed by a final order of a bankruptcy court would be categorically barred from seeking review. The only person permitted to appeal would be a trustee who has no personal stake in challenging an Order for Relief and every financial incentive to leave it undisturbed. Nothing in the Bankruptcy Code, the case law, or the history of appellate practice, supports such a result.

## IV.   THE BANKRUPTCY COURT'S LAND VALUATION FINDING WAS CLEARLY ERRONEOUS

Appellees' arguments in sections III(A) (value is "irrelevant") and III(B) (evidence was "inconclusive") share a single theme. [D.I. 33, pp. 25–30]. Appellees cannot defend the Bankruptcy Court's improper use of judicial notice or the clearly erroneous valuation it produced. Their strategy is not to confront the error, but to deny its significance.

### A. The Bankruptcy Court Misread the Form 10-Q

The Bankruptcy Court found that the Debtor "lists the value of its land holdings at $4,691,430." (Opinion, A0450)  Nevertheless, Appellees now claim that the Court did not take judicial notice of this "value" and that the value of the Property is not "relevant" to the Bankruptcy Court's decision.

The Court's Opinion, however, is quite clear. The Bankruptcy Court took judicial notice of the supposed "value" of the Debtor's land holdings, misread the entry in the Form 10-Q, substituted 1993 cost for 2024 land value, and then relied on that erroneous value to deny conversion to Chater 11 and to justify an Order for Relief. Appellees cannot rewrite the Opinion to avoid the consequences of that error. Because the valuation was erroneous, every conclusion built on it is likewise erroneous.

8

## B. The Bankruptcy Court Used Judicial Notice Improperly

Appellees claim the Bankruptcy Court never took judicial notice of the "value of [the Debtor's] land holdings." This position is completely at odds with the Court's written Opinion and conclusions.

The Bankruptcy Court relied on judicial notice to supply a valuation not found in the record and that no witness ever testified to. Judicial notice cannot be used to establish a disputed fact, to supply missing evidence, or to override trial testimony. The Court's reliance on judicial notice to replace "inconclusive" testimony is itself reversible error.

In an attempt to avoid this reversible error, Appellees claim that because the entire Form 10-Q was admitted in evidence, the Court could take judicial notice of *anything* in it, without notifying the Debtor and giving the Debtor an opportunity to address it. The Bankruptcy Court did not take judicial notice of the entire twenty-six-page Form 10-Q. It selected a single accounting entry, misread it as a valuation, and relied on that mistake, without giving the Debtor the notice and opportunity to be heard that Rule 201 requires. Had the Court notified the Debtor, as required under the Rule, the error would have been avoided. Admitting a document in evidence does not authorize a court to take judicial notice of a "valuation" that does not even appear in the document.

Appellees misrepresent the record by asserting that "the Debtor did in fact challenge the Petitioning Creditors' reliance on the September 2024 10-Q's statement as an indication of value of the Property," citing A0441. But A0441 is a section of the Debtor's brief addressing abstention and refers to a different Form 10-Q dated June 30, 2024. Nothing in that brief, or anywhere else in the record, could have possibly put the Debtor on notice that the Court would later take judicial notice of a supposed "value" that does not appear in a different Form 10-Q, six months after trial and after the evidentiary record had closed.

Appellees' refusal to even acknowledge that the Court took judicial notice is understandable. The Court relied on judicial notice to replace allegedly "inconclusive" testimony with its own clearly erroneous value, which constitutes reversible error.

## C. Valuation Was Central to the Bankruptcy Court's Reasoning

Appellees claim that the value of the Property has no "relevance" to the Bankruptcy Court's denial of the motion to dismiss. [D.I. 33, p.34] This assertion cannot be reconciled with the Bankruptcy Court's own reasoning. The Court did not treat valuation as irrelevant. It treated valuation as dispositive.

The Opinion expressly states that "Diamondhead's September 2024 10-Q… lists the value of its land holdings at $4,691,430." The Court relied on this "value" to conclude that the Debtor's liabilities exceeded its assets, that the Debtor was

10

insolvent, that liquidation was in the best interests of creditors, that there was no prospect of rehabilitation, that conversion was futile, and that a Chapter 7 served a valid bankruptcy purpose. None of those conclusions can exist without the valuation finding. If valuation were irrelevant, the Court could not have reached any of these determinations.

Appellees' arguments are internally inconsistent. They cannot simultaneously argue that valuation has no "relevance" while defending an Order for Relief that depends on the Court's valuation finding. The Bankruptcy Court's reasoning shows that valuation was central to its analysis. The Court misread the Form 10-Q, substituted 1993 cost for 2024 market value, and then relied on that erroneous number to justify liquidation. Appellees' effort to erase valuation from the case is simply an attempt to avoid the consequences of that error.

Because the valuation finding was clearly erroneous, and because the Bankruptcy Court's conclusions were built upon that finding, Appellees' "irrelevance" argument must fail.

### D. The Nonpayment of Debts Alone Does Not Mandate an Order for Relief Under §303(h)

Appellees' contention that the nonpayment of debts alone warrants a Chapter 7 Order for Relief under §303(h) is legally incorrect. Section 303(h) does not require that a court enter an Order for Relief solely because a debtor is "not paying debts as they become due." Appellees' position would convert §303(h) into a strict-liability

11

rule. Once a debtor is not paying its debts as they become due, there is nothing more for a Bankruptcy Court to do. An Order for Relief <u>must</u> follow.

This strict liability interpretation was expressly rejected by the Third Circuit in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). In that case, there was no issue as to whether the Debtor was paying its debts as they became due. "The parties agree Forever Green is not paying its debts." *Id.* at 333. Nevertheless, the Third Circuit held that "Section 303(h)(1), [], does not provide that a bankruptcy court "shall order relief" against a debtor who is not paying its debts...." A debtor's nonpayment "is a necessary but not sufficient condition for ordering relief." *Id.* at 334. The Third Circuit could not have been any clearer. Appellees are incorrect as a matter of law.

*Forever Green* is remarkably similar to the case at bar. The Court went on to affirm the dismissal of the involuntary petition in the case based on conduct similar to that which occurred here after finding that such conduct constituted "bad faith." Based on *Forever Green*, the Order for Relief should be vacated based on Petitioners' bad faith alone.

### E. The Court's "Inconclusive" Characterization Does Not Cure Its Erroneous Valuation Finding

The Appellees' reliance on the Bankruptcy Court's reference to the valuation evidence as "inconclusive" does not help its position. The Court did not deny the Debtor's motion to dismiss because the evidence was "inconclusive." It denied the

12

motion because it took judicial notice of a supposed "value" and supplied its own valuation.

What actually occurred is straightforward. After the record closed, the Court took judicial notice of a "value" that appears nowhere in the Form 10-Q, and without giving the Debtor an opportunity to be heard, in violation of Rule 201(e), it then used that number as a basis for ordering liquidation. Appellees now seize on the word "inconclusive" as if it were the Court's basis for its ruling. It was not. The Court did not reject the Debtor's evidence. It replaced it.

That is not an exercise of discretion. It is a substitution of an erroneous factual finding for trial evidence. And because the Court's analysis rested on the improper judicial notice valuation, the error is not harmless and cannot be cured by retroactive emphasis on the word "inconclusive."

## F. The Valuation Evidence Was Uncontroverted

Appellees do not address the uncontroverted valuation evidence presented at trial. The record contains **joint exhibits** that show, *inter alia*, that Colliers International was marketing the Property for $60 million and that offers were received for gaming-approved acreage at $1 million per acre.

Appellees do not deny that the only valuation testimony in the record came from the Debtor's three witnesses, including the Debtor's President and Vice-President, whose valuation testimony was admissible under Federal Rule of

13

Evidence 701. Petitioners offered no expert, no appraiser, no broker, and no witness valuation testimony to rebut those witnesses or the joint exhibits introduced in evidence.

The Bankruptcy Court was not free to disregard uncontroverted Rule 701 valuation testimony and documentary evidence simply because no expert testified. The absence of expert testimony does not render the evidence "inconclusive;" it renders it unrebutted. A court may not ignore uncontroverted admissible evidence and then substitute its own valuation based on judicial notice taken after the evidentiary hearing.

Because the only valuation evidence in the record supported the Debtor, and because Petitioners offered no rebuttal evidence, the Court's substitution of a judicially-noticed "value" for the trial evidence, was clear error.

## G. The Record Confirms the Valuation Error Was Not Harmless

Appellees' argument depends on pretending the Bankruptcy Court did not do what it plainly did. But the Opinion is unambiguous. The Court relied on valuation. It misread the Form 10-Q. It adopted a land value that appears nowhere in the record. It took judicial notice improperly and without the notice Rule 201(e) requires. And it used that erroneous valuation to justify liquidation.

14

Because the valuation finding was clearly erroneous, and because every subsequent conclusion rested on that flawed premise, the error is not harmless and the Order for Relief cannot stand.

## V. THE UNDISPUTED EVIDENCE DEMONSTRATES BAD FAITH UNDER *FOREVER GREEN*

Appellees assert that the Bankruptcy Court "thoroughly examined" bad faith and correctly found that the Petitioning Creditors acted in good faith. But the bad-faith record is not mixed or ambiguous; it is one-directional, and the material facts demonstrating Petitioners' bad faith are undisputed. Under *Forever Green*, undisputed bad-faith evidence is independently dispositive and requires dismissal of an involuntary petition. Appellees do not confront that evidence. Their brief avoids the trial record that compels dismissal, and their silence on the core bad-faith facts underscores the weakness of their position.

### A. Petitioners' Own Testimony Shows They Used the Threat of Bankruptcy to Obtain Additional Attorneys' Fees

Appellees do not deny that Petitioners' own attorney testified under oath that Petitioners would not have filed the Involuntary Petition if the Debtor had agreed to pay an additional $50,000 in attorneys' fees, just sixty-two days after the Debtor had already agreed to pay $175,000 in attorneys' fees to settle *Arneault v. Diamondhead Casino Corporation*, (C.A. No. 16-cv-00989-MN) (D. Del. 2016) ("the Collection

15

Case"). This testimony demonstrates that the Petitioners used the threat of bankruptcy as leverage to pressure the Debtor into paying additional legal fees.

Threatening bankruptcy is precisely the type of behavior the Third Circuit has condemned. As the Third Circuit found in *Forever Green*, "[Dawson] also threatened to file an involuntary petition unless Forever Green agreed to stop the proceedings. Keeping his word, Dawson filed an involuntary petition after Forever Green tried to reinstate the arbitration." *Forever Green,* at 336.

Threatening bankruptcy to coerce payment of attorneys' fees is the textbook definition of bad faith. Appellees do not address this testimony. They do not explain how threatening bankruptcy to obtain attorneys' fees could possibly constitute good faith. They do not cite any case holding that such conduct is permissible.

## B. Appellees Ignore Evidence That Petitioners Sought to Seize the Eminent Domain Proceeds

Appellees do not deny the documentary evidence showing that Petitioners sought to seize the entire $1 million eminent domain settlement obtained by the Debtor's subsidiary, Mississippi Gaming Corporation. They do not deny that Petitioners demanded to be paid ahead of all other creditors, including the other similarly-situated debenture holders, and ahead of the Appellant, with whom they allegedly shared a first lien in *pari passu*.

They do not deny that in doing so, they were seeking what clearly constitutes a preference payment prohibited under the Bankruptcy Code. They do not deny that

16

Petitioners attempted to divert the proceeds of the eminent domain settlement to themselves outside the bankruptcy process.

Petitioners' attempt to obtain a preference outside bankruptcy is itself evidence of bad faith because it seeks to distort creditor priority for personal advantage. This conduct is irreconcilable with good faith and independently supports dismissal under *Forever Green*.

## C. Petitioners Sought to Circumvent the Mississippi Foreclosure Remedy

The Land Deed of Trust expressly provides for judicial foreclosure in Mississippi in the event of any default, identifies the procedures to be followed, and names the trustee who would conduct the sale. Petitioners agreed to this remedy. Instead, they filed an involuntary bankruptcy petition to circumvent the agreed-upon state-law process. Appellees do not explain how bypassing the foreclosure remedy they agreed to use constitutes good faith.

Appellees sought to circumvent the Mississippi foreclosure process in the Land Deed of Trust without having to comply with Mississippi law. This is precisely the type of improper purpose that *Forever Green* prohibits. *Forever Green*, at 335. Bankruptcy cannot be used to evade state-law foreclosure procedures. A creditor's deliberate decision to bypass the very remedy it negotiated is classic evidence of bad faith.

**D. Petitioners Misrepresented Debenture Ownership to the Bankruptcy Court**

Petitioners misrepresented the identity of debenture holders to the Bankruptcy Court and continue to do so here. ("The Petitioning Creditors are each holders of collateralized convertible senior debentures…") (Emphasis added.) (D.I. 33, pp. 8-9). The Petitioner identified as "J. Steven Emerson, as Successor to the J. Steven Emerson Roth IRA," is not a debenture Holder. Petitioners' own exhibits filed with the Bankruptcy Court confirm that there is no such Holder of any debenture and no Assignment exists transferring any debenture to this alleged "Holder."

Petitioners also claimed in the Bankruptcy Court, and continue to do so here, that "the Petitioning Creditors, other than John Hawley, filed an action against Diamondhead in the United States District Court for the District of Delaware…" [D.I. 33, p. 16] and that they had a Judgment against the Debtor. However, as their own footnote 2 on page 16 of their Answering Brief confirms, the Petitioner identified as "J. Steven Emerson, as Successor to the J. Steven Emerson Roth IRA," never sued the Debtor and never obtained a Judgment. This fact can be judicially noticed by simply checking the docket in the Collection Case.

Petitioners relied on a Judgment obtained by fabricating diversity jurisdiction in the District Court. Each fact on which fabrication rests can be verified by simply taking judicial notice of the pleadings and exhibits that Petitioners themselves filed

18

in *Arneault v. Diamondhead Casino Corporation*, (C.A. No. 16-cv-00989-MN) (D. Del. 2016).

These facts demonstrate unclean hands and bad faith. Appellees' do not address the misrepresentations made to the Bankruptcy Court, let alone to this Court. Petitioners' inability to produce an Assignment, and counsel's recent admission that none exists, confirms that the underlying judgment rests on fabricated jurisdiction. Filing an Involuntary Petition based on a judgment obtained by fabricating subject-matter jurisdiction in another court is itself bad faith and is incompatible with the requirement that Petitioners come into bankruptcy court with clean hands.

**E. The Bankruptcy Court Failed to Consider Certain Material Evidence**

Appellees assert that the Bankruptcy Court "considered" the evidence. However, the record shows that the Bankruptcy Court failed to consider certain outcome-determinative evidence.

Appellees own witness testified that Petitioners threatened bankruptcy to obtain additional attorneys' fees and that the bankruptcy would never have been filed had they gotten them. They do not deny that their own documentary evidence shows they attempted to obtain one hundred percent of the eminent domain proceeds from the subsidiary's settlement, a clear attempt to obtain a preference payment. The Court did not address these critical, undisputed facts which plainly establish bad faith. The Court did not address the circumvention of the Land Deed of Trust, since

19

it was under the misimpression that the document was not even in evidence, although it appears as an exhibit twice.

A court commits clear error when it ignores material, undisputed evidence directly bearing on bad-faith. The Third Circuit has made clear that using bankruptcy "as a litigation tactic or to gain a disproportionate advantage" constitutes bad faith. *Forever Green*, at 336. Because the undisputed evidence establishes pre-petition bad faith and because the Bankruptcy Court failed to consider material, undisputed evidence of bad faith, reversal is required.

## VI.   THE RECORD DOES NOT SUPPORT THE BANKRUPTCY COURT'S FINDING OF DISSIPATION OF ASSETS

### A. There is No Evidence of Any Dissipation of Assets in the Record

There is no evidence of any "dissipation of assets" in the record.   A finding of dissipation must be supported by evidence in the record. Here, there is none. The Petitioners did not identify a single incidence of any dissipation of assets. No witness testified as to any dissipation of assets. No document was introduced in evidence to even suggest there was any dissipation of assets.

Nevertheless, despite this complete absence of evidence, the Bankruptcy Court concluded, based solely on its own post-trial review of selected SEC filings, that the Debtor had "dissipated assets" because its assets had decreased while its liabilities increased. That conclusion is not supported by the record.

As the Form 10-Q's themselves show, the entries the Court relied on do not reflect dissipation; they reflect ordinary business activity. The Court's inference that a change in balance sheet totals equates to "dissipation" is legally incorrect and factually unsupported. It reduces "dissipation" to ordinary fluctuations in financial reporting.  Liabilities rise and assets fall in the normal course of business. If this were the test, some of the most successful companies in the world would be guilty of "dissipating assets" every quarter.

**B. Ordinary and Necessary Business Expenses Are Not "Dissipation" By Definition or as a Matter of Law**

The Court's finding equated normal operating expenses and expenditures with dissipation. Webster's New Collegiate Dictionary (1974) defines "dissipate" as "to expend aimlessly or foolishly." There is not a single "aimless or foolish" or otherwise improper expenditure to be found in the record because none exists.

Appellees do not deny that Debtor's expenditures were ordinary, necessary, business expenses required to maintain the Debtor, its subsidiaries, its Mississippi Property and its regulatory status with the SEC. All of the Debtor's expenditures were audited by an outside public company auditing firm and fully disclosed in filings with the SEC. The principle that businesses must incur normal operating expenses to function is so well understood it really should not require citation to any legal authority. Nor do the Appellees cite any authority to the contrary. Ordinary financial activity cannot be treated as misconduct without evidence of bad faith.

21

Courts in the Third Circuit uniformly hold that dissipation requires evidence of misconduct, concealment, diversion, waste, or extraordinary depletion. *Hill, et al. v. Cohen, et al.* (No. 22-2023 )(3d Cir. 2022), a precedential decision, is instructive here. The Third Circuit <u>reversed</u> the District Court's appointment of a custodian for abuse of discretion. It found "[t]he District Court's decision to replace the corporate governance structure of a publicly-traded company, while no doubt well-intended, did not reflect the required caution, circumspection, or justification for such a drastic step." *Id.* at p.4. It said:

> Mere speculation of fraud will not justify appointing a custodian, particularly when that speculation is based on nothing more than the plaintiff's unsupported allegations. See, e.g., *Tyler v. O'Neill*, 1998 WL 695991, at *3 (E.D. Pa. Oct.6, 1998)(declining to appoint a custodian where there were "no substantiated allegations of present waste, mismanagement, fraud, or dissipation."), *aff"d*, 189 F.3d 465 (3d Cir. 1999)

The Court found "[t]he District Court's terse reasoning and the lack of any well-developed evidentiary record expose[d] the insufficient factual basis for the findings of fraud and waste. *Id.* at p. 29. The Court also cited *In re Tower, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005)(explaining that to constitute corporate waste under Delaware law, "the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.")

22

As in *Hill*, the entry of an Order for Relief and appointment of a Trustee in this case is based on a record devoid of any evidence of dissipation. Given the absence of evidence, such a finding cannot stand.

## C. The Bankruptcy Court Improperly Took Judicial Notice of SEC Filings and Misinterpreted Them

Appellees do not deny that the Bankruptcy Court took judicial notice of accounting entries in three Form 10-Q's after the evidentiary record closed and without giving the Debtor notice or an opportunity to be heard, in violation of Fed. R. Evid. Rule 201(e). They do not deny that the Bankruptcy Court relied on a selective use of SEC filings to reach its conclusion.

Judicial notice cannot be used to establish disputed facts, interpret complex financial documents, or supply evidence. Yet, that is precisely what occurred. The Court treated its own interpretation of accounting entries as if they were *evidence* of dissipation. In a case where there was no identification of a single incidence of dissipation to begin with, it is clearly reversible error.

## D. Appellees Identify No Evidence of Misconduct, Waste, or Improper Transfers

In their Answering Brief, Appellees do not identify a single improper payment, a single insider transfer, a single concealed transaction, a single act of waste, a single act of misconduct, or a single expenditure lacking a rational business purpose. They cannot do so because the Debtor's expenditures were routine,

necessary, business expenses. A factual finding unsupported by any evidence is clearly erroneous.

**E. The Dissipation Finding Fails Under Any Standard of Review**

Even under the most deferential standard, a factual finding must be supported by evidence in the record. Here, there is none. Appellees' inability to identify a single instance in which funds were spent improperly confirms that the Bankruptcy Court's dissipation finding was legally improper, factually unsupported, and clearly erroneous. Because the dissipation finding lacks any evidentiary foundation and is legally unsustainable, it cannot support the Order for Relief and requires reversal.

## VII. THE COURT ERRED IN DENYING THE DEBTOR'S ONE-TIME STATUTORY RIGHT TO CONVERT UNDER §706(a)

**A.    Section 706(a) Grants a One-Time Statutory Right to Convert**

Section 706(a) provides a debtor with a one-time statutory right to convert a Chapter 7 case to Chapter 11 unless (1) the case has previously been converted; or (2) the debtor has acted in bad faith. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007).  This case had not previously been converted and the Court made no finding of bad faith. Appellees do not dispute this.

**B.  A Finding of Bad Faith Was Required to Deny Conversion**

Appellees cite *In re NLG, LLC,* 2023 WL 2053920 (Bankr. D. Del. Feb. 13, 2023) in sole support of their position that conversion is not absolute. But NLG not only fails to support their position, it supports Appellant.

24

First, the **Debtor's** right to convert in this case arises under §706(a). The movant in NLG was not the Debtor, but a **party in interest,** whose request for conversion was governed by §706**(b).** Courts evaluating §706(b) motions routinely consider feasibility and other factors that have no application under §706(a). The Bankruptcy Court in NLG therefore evaluated whether the §706(b) movant could satisfy the requirements of the destination chapter and found it could not. That standard is irrelevant here.

Second, Appellees incorrectly suggest that *NLG* relied on §1112(b) to deny conversion. It did not. The Court denied conversion based on §105(a) of the Bankruptcy Code to prevent an abuse of the bankruptcy system. *Id.* at 19. No such abuse of the bankruptcy system on the part of Debtor is present here. Because bad faith is the only recognized basis for denying a debtor's one-time right to convert under §706(a), the Debtor's statutory right to convert should have been granted.

## C.  The Bankruptcy Court Applied the Wrong Legal Standard

Appellees claim that conversion was properly denied because the Debtor lacked a "reasonable likelihood of rehabilitation" and had "no operations, no funds, escalating debt, and an inability to sell or develop the Property." As Appellant showed, these are §1112(b) dismissal factors, not §706(a) eligibility factors. However, nothing in §706(a) authorizes a court to deny conversion based on its own prediction as to whether a Chapter 11 plan might ultimately succeed.  Moreover,

25

Congress made it clear that Chapter 11 expressly permits liquidating plans and does not require ongoing operations, future profitability, or a likelihood of rehabilitation.

Appellees cite no case holding that §1112(b) factors may be used to deny a debtor's one-time statutory right to convert under §706(a) absent bad faith. Their inability to identify any such authority confirms that the Bankruptcy Court applied the wrong standard by substituting feasibility and rehabilitation considerations for bad faith.

**D. Petitioners' Chapter 13 Analogy Fails Because Chapter 11 Contains No Comparable Eligibility Restrictions**

Appellees attempt to analogize conversion to Chapter 11 with conversion to Chapter 13. The analogy fails because the Bankruptcy Code treats conversion to Chapter 11 and conversion to Chapter 13 in fundamentally different ways. Chapter 13 imposes strict, technical eligibility limits that simply do not exist in Chapter 11.

Under Chapter 13, a debtor must satisfy specific statutory prerequisites before the case may even commence. Chapter 13 is available only to an "individual with regular income" whose non-contingent, liquidated debts fall below a fixed statutory cap. 11 U.S.C. §109(e). If a debtor does not meet those limits, the debtor is ineligible for Chapter 13 and §706(d) prohibits conversion into that chapter.

Chapter 11 contains no comparable restrictions. There is no income requirement, no debt cap, and no financial-profile test. Section 109(d) makes Chapter 11 available to any debtor eligible for Chapter 7, including corporations like

26

the Debtor. Congress structured Chapter 11 to accommodate both reorganizations and liquidations. Eligibility does not depend on operations, revenue, or rehabilitation prospects.

Because Chapter 13 has narrow statutory limits and Chapter 11 does not, courts routinely deny conversion to Chapter 13 "for cause" when a debtor fails §109(e)'s requirements. That rationale has no application to Chapter 11, where no such limits exist.

Section 706(d) bars conversion only when "the debtor may not be a debtor" under the destination chapter. A debtor is barred from converting to Chapter 13 when §109(e) renders the debtor ineligible. A debtor is barred from converting to Chapter 11 only when §109(d) renders the debtor ineligible. The Debtor here plainly satisfies §109(d). Accordingly, §706(d) does not bar conversion. Thus, Petitioners' Chapter 13 analogy has no application here.

**E.   Appellees Ignore Additional Undisputed Evidence Supporting Conversion**

Appellees ignore the undisputed evidence showing that conversion to Chapter 11 was in the best interests of creditors. Colliers International was actively marketing the Property and had received expressions of interest, the Company's President had arranged for debtor-in-possession financing, the Debtor was pursuing a joint venture, there were pending eminent domain issues that required specialized Mississippi state-court resolution, and a Chapter 7 liquidation risked the loss of the Debtor's

27

most valuable entitlement, Mississippi Gaming Site Approval. Appellees dispute none of this.

## F. Appellees Do Not Address the Risk of Losing Mississippi Gaming Site Approval

Appellees do not dispute that the Mississippi Gaming Commission's award of Gaming Site Approval to Mississippi Gaming Corporation, a subsidiary of the Debtor, gives the Diamondhead Property its value and that its loss would destroy the value of the Property. Appellees do not deny that the Debtor's Mississippi Gaming Site Approval is revocable and that a Chapter 7 liquidation poses a substantial risk of loss of this entitlement.

Appellees offer no explanation as to why a Chapter 7 liquidation, which risks forfeiting this entitlement, is preferable to a Chapter 11 process designed to preserve the asset and maximize value. Their failure to address this critical issue is understandable. There is no justification for assuming such a risk.

## G. Conversion Would Have Maximized Value for All Creditors

Conversion to Chapter 11 would have allowed the Debtor to pursue a sale through a structured, value-maximizing process. Appellees do not deny that a Chapter 7 liquidation is likely to result in a fire-sale auction that will not maximize value. Their Answering Brief offers no response to this obviously dangerous outcome which would not maximize the value of the estate, but destroy it.

28

## H.  Costs and Administrative Expenses Are Irrelevant Under §706(d)

Cost considerations are irrelevant to the §706(d) analysis. Conversion under §706(d) turns solely on whether the debtor "may be a debtor" under the destination chapter, not on the relative expenses of Chapter 7 versus Chapter 11 or the perceived efficiency of continued operations. Courts do not conduct a cost-benefit analysis when determining eligibility, and neither administrative expenses nor projected fees bear on whether the debtor satisfies §109(d). Because the only question is statutory eligibility, Appellees' expense arguments, assuming *arguendo*, they are correct, are legally immaterial and cannot justify denying conversion.

## I.  The Bankruptcy Court's Denial of Conversion Was an Abuse of Discretion

Because the Bankruptcy Court made no finding of bad faith on the part of the Debtor and applied the wrong legal standard, its denial of conversion constitutes an abuse of discretion. The denial of Debtor's one-time statutory right to conversion was incorrect as a matter of law and must be reversed.

### CONCLUSION

The Bankruptcy Court's decision to enter an Order for Relief against a publicly traded company cannot be sustained on this record. For the reasons set forth above and in Appellant's Opening Brief, the Order for Relief should be vacated and the involuntary petition dismissed.

Dated: March 20, 2026

Respectfully submitted,
/s/ Deborah A. Vitale
Deborah A. Vitale
1013 Princess Street
Alexandria, Virginia 22314
Telephone: (727) 510-1412
Email: vitaledav@aol.com

*Appellant, Pro Se*

30